UNITED STATES of America, Plaintiff,

v.

Thomas W. EASTMAN, et al., Defendants.

Civ. No. 75–1158 ME.

United States District Court, D. Oregon.

Aug. 21, 1981.

As Amended Sept. 1, 1981.

Henry C. Lorenzen, Asst. U. S. Atty., Portland, Or., for plaintiff.

William A. Mansfield, Medford, Or., for defendants.

## OPINION

JAMES M. BURNS, Chief Judge.

This is a condemnation action brought by the United States to acquire land owned by Thomas W. and Thelma M. Eastman. The issue now before the court is whether evidence of "enhanced value" may be introduced at the forthcoming jury trial on the issue of just compensation. For the reasons set forth below, I conclude that evidence of enhanced value is admissible.

## BACKGROUND

In 1962, Congress enacted Public Law No. 87–874, 76 Stat. 1173 and thereby approved the Rogue River Basin Project proposed by the Army Corps of Engineers. The principal components of the project were three dams which were to be built at various sites in the Rogue River basin. One of these dams was to be located on the Rogue River in Jackson County, Oregon, at a site known as Lost Creek.

Prior to 1970, the Eastmans owned two tracts of land, designated as tracts 203 (about 330 acres) and 204 (about 440 acres), in Jackson County along the Rogue River. The Eastmans used this land for ranching purposes. The Lost Creek Dam was to be located immediately downstream from the Eastmans' property. Completion of the dam as originally proposed would have meant that all of tract 204 and part of tract 203 would be inundated by the impounded waters. The portion of tract 203 remaining above the water line would be located on or near the north shore of the resulting reservoir.

The boundaries for the Lost Creek Dam and Reservoir Project were first drawn in 1966. They encompassed all of tract 204 and approximately ⅔ of tract 203. Later, in 1970, the boundaries were redrawn so that less of tract 203 was needed. As modified in 1970, the project was to include all of tract 204 and only the lower ⅓ of tract 203.

In 1970, the government entered into negotiations with the Eastmans for the purchase of tract 204 and the lower ⅓ of tract 203. The negotiations were eventually successful; a price of $625,000 was agreed upon. As a part of the transaction, the Eastmans reserved right of ways which were to provide access to their remaining land. The government had promised Jackson County it would build a county road along the north shore of the reservoir. The Eastmans' reserved right of ways were to connect with this county road. The government agreed with the Eastmans that it would construct the access approaches to the road, but the Eastmans were to be responsible for constructing the actual access roads. On October 19, 1970, the Eastmans consummated this transaction by deeding the property to the government.

Sometime before 1975 the Corps of Engineers discovered that the Lost Creek Reservoir, once completed, might suffer from a turbidity problem due to soil erosion from nearby lands. The Corps decided that it would be necessary to revise plans for the project to control this possible problem. The Corps cancelled a recreational facility proposed for the north shore of the reservoir, and eliminated the planned county road. In 1974, the Corps also revised the "final taking line" for the project so that the remainder of tract 203, still owned by the Eastmans, was included. In 1975, the government initiated this condemnation action to acquire the remainder of tract 203. The Eastmans contest the government's assessment of the compensation due for this second taking, and have requested a jury trial.

As a result of pretrial proceedings, the issue of enhanced valuation was segregated from the rest of the case.[1] The government has, in effect, made a motion *in limine* to exclude evidence of enhanced value from the jury trial. This motion is based on the natural assumption that the remainder of the Eastmans' property has increased in value because of its proximity to the government created reservoir. If the jury may consider evidence of value which includes the increment of value attributable to the government project, then the condemnation award will be based on the property's "enhanced value."

Relying on the Supreme Court's decision in *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the government contends that the remainder of tract 203 is within the scope of the original project; therefore, a condemnation award based on enhanced value is improper. The Eastmans, on the other hand, assert that the government is estopped from claiming that the remainder of tract 203 is within the scope of the project. This estoppel theory is based on statements allegedly made by government representatives during the 1970 negotiations. The Eastmans also con-

---

1. A hearing on the issue of enhanced value was held in June 1979. Testimony from several witnesses, a stipulation of agreed facts and numerous documentary exhibits were received by the court. Thereafter, counsel submitted briefs and memoranda of law. The last brief was filed in late June 1980. I express to the parties my keen regret for my having taken so long to issue this opinion.

tend that even if the government is not estopped, enhanced value must be included in the condemnation award because the remainder of tract 203 is outside the scope of the original project.

DISCUSSION

■ In *United States v. Miller*, the Supreme Court set out a general rule for determining when the government must pay for enhanced value created by government improvement projects. In pertinent part, the Court said:

> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value·as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be

allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

> The question then is whether the respondents' lands were probably within the scope of· the project from the time the Government was committed to it. If they were not, but merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

317 U.S. 376–77, 63 S.Ct. 281 (footnotes omitted).[2]

Despite the nearly forty years since the *Miller* decision, it has remained the most authoritative pronouncement of the scope of the project test. In *United States v. Reynolds*, 397 U.S. 14, 90 S.Ct. 803, 25

**2.** A difficult issue (not discussed by either party in their briefs) is whether the *Miller* scope of the project test can be applied to these facts. Under the facts in *Miller*, the government had initially taken land for the improvement project and then condemned land from an entirely separate tract of land. The Supreme Court, in fact, phrased the scope of the project rule in terms of "distinct" tracts. In this case, unlike *Miller*, the second taking is from the same tract of land.

Logically, there may be no difficulty in extending the scope of the project test to a second taking from the same tract of land. In practical terms, however, a real problem could arise from the fact that an offset for benefits might have been made in the first taking. Where only part of a tract of land is taken, the government is entitled to deduct from the condemnation award benefits which accrue to the landowner's remaining land in the same tract. *See* 33 U.S.C. § 595; *Bauman v. Ross*, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1896). If the government later decides to also take the land supposedly benefitted, the enhanced value of the land must be paid for the landowner to receive the pre-project value of the entire tract of land. Applying the scope of the project rule

to exclude enhanced value would result in the landowner receiving insufficient compensation for the loss he has suffered. *See generally United States v. 62.17 Acres of Land, More or Less, in Jasper County, Texas*, 538 F.2d 670, 674–75 (5th Cir. 1976).

Nonetheless, the federal cases which have dealt with second takings from the same tract have applied the scope of the project rule. *See, e.g., Jasper County; United States v. Crance*, 341 F.2d 161 (8th Cir.), *cert. denied*, 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965); *United States v. 172.80 Acres of Land, More or Less, in Mercer County, Pennsylvania*, 350 F.2d 957 (3rd Cir. 1965). Except for *Jasper County*, none of these cases explicitly recognized a possible conflict between the offset for benefits rule and the scope of the project rule. But, the *Jasper County* decision indicates that the scope rule may be applied despite such a possible conflict. Moreover, since I conclude that enhanced value is a proper element of the Eastmans' condemnation award, I am not faced with a situation where the landowner may not receive the pre-project value of the entire tract. Thus, I conclude the scope of the project rule may be applied in this case.

L.Ed.2d 12 (1970), the Supreme Court reaffirmed the *Miller* test and added the following comment:

> We think the test was stated with admirable clarity by a unanimous Court in *Miller:* if the "lands were probably within the scope of the project from the time the Government was committed to it," no enhancement in value attributable to the project is to be considered in awarding compensation. As with any test that deals with probabilities, its application to any particular set of facts requires discriminating judgment. The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.

397 U.S. 21, 90 S.Ct. 807.

Two cases with facts similar to this one illustrate how "discriminating" the judgment must sometimes be. In *United States v. Crance*, 341 F.2d 161 (8th Cir.), *cert. denied*, 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965) and in *United States v. 172.80 Acres of Land, More or Less, In Mercer County, Pennsylvania*, 350 F.2d 957 (3rd Cir. 1965) the courts were concerned with second takings necessitated by government dam and reservoir projects. In both cases, the government originally purchased part of the landowners' property to be used as part of the reservoir site. In both cases, the government subsequently condemned more of the landowners' property for recreational facilities adjoining the reservoirs. In *Crance*, the court ruled that the landowner was not entitled to the enhanced value of the land involved in the second taking. The court stressed the fact that the project had contemplated the need for recreational facilities from the outset. Even though no facilities had originally been planned for the landowner's side of the reservoir, the landowner's property was within the scope of the project because it abutted the reservoir and was, therefore, within the "sphere of probable acquisition."

On the other hand, in *Mercer County*, the court found that the landowner's property was not within the scope of the project. The court distinguished *Crance* by noting that this reservoir project had not included recreation areas from the outset. The decision to construct recreational facilities occurred after a change in the government's policy toward recreation. The court also distinguished *Crance* on the basis of representations made by the government agents when the government first purchased part of the landowner's property for the reservoir. The agents had informed the landowner that none of the rest of his property would be needed.

Another case with facts similar to this one was *United States v. 62.17 Acres of Land, More or Less, In Jasper County, Texas*, 538 F.2d 670 (5th Cir. 1976). In *Jasper County*, the court was concerned with a second taking for a government dam and reservoir project. The second taking was required because the government had made a surveying error when the original plans for the project were made. In determining whether the additional lands were within the scope of the project, the court identified three factors to consider: 1) the foreseeability of any change in the project so that property in question might be included; 2) the length of time between the commencement of the project and the condemnation of the property in question; and 3) the Government representations concerning the finality of the project as announced. Applying these factors to the record in that case, the court stated that the land needed for the second taking was probably within the scope of the project, although it remanded the case to the trial court so that further evidence could be taken. The court based its tentative conclusion on "the likelihood of some mistakes in surveying and the probability that this perimeter acreage would be subject to adjustment for any such mistake." 538 F.2d 681.

Utilizing the cases discussed above and others, the Fifth Circuit recently undertook a comprehensive review of the scope of the

project test and its application. In *United States v. 320.0 Acres of Land, More or Less in County of Monroe, State of Florida*, 605 F.2d 762 (5th Cir. 1979), the court began by examining two important principles used in determining market value in condemnation actions. The first principle, universally applied, is that value resulting from the government's demand for the property must be excluded from any condemnation award. The second principle, applied only infrequently, is that the condemnee is not to be compensated for the value of benefits conferred on his property by virtue of its proximity to government property. The court observed that the *Miller* scope of the project test paralleled the distinction between "value attributable to government demand" and "value from Government-conferred benefits." The scope rule, the court said, "excludes compensation for the former but commands compensation for the latter." *Id.* at 787. The court was careful to note, however, that the *Miller* court did not set out its test in these terms. *Id.* at 788.

The Fifth Circuit then reviewed a number of scope of the project decisions. It placed particular emphasis on the three factors announced by the court in *Jasper County*. The court concluded its general discussion of the scope of the project rule with the following passage:

> This review of prior decisions that have struggled with whether lands were probably within the scope of the Government's original project or not illustrates that the "scope" test announced in *Miller*, while a convenient rule of thumb in many cases, does little more than restate the problem in difficult cases. In those cases, it is often necessary to confront the underlying problem head-on: would compensation for value attributable to the very project for which property is taken be just or unjust? *Miller* and *Reynolds* teach that compensation would not be just, and therefore is not required, if the additional value reflects the Government's special demand for the property for a public project through eminent domain. But they also teach that compensation *is* required, and just, where the

increment in value attributable to the Government project is instead an element of fair market value inherent in the property's proximity to the Government project.

Whether or not that increment in value is attributable more to the Government's special demand for the property or more to private market demand for benefits conferred upon the property by its proximity to the Government project is largely a function of reasonable expectations. The crucial inquiry is whether, after commencement of project A but prior to condemnation of property X, the owner or a private purchaser contemplating acquisition and development of property X could *reasonably* anticipate that he would be able to devote that property to its highest economic use, enjoying the advantages inherent in its proximity to the nearby Government project, without serious apprehension that property X would soon be condemned.

The factors identified in *Jasper County* will often be relevant to this inquiry. For example, if the Government unequivocally represents to the landowner or the public that it will not need property X for project A, the Government in effect relinquishes property X as enhanced by its proximity to project A to private market forces. Although not as decisive, the length of time between commencement of project A and condemnation of property X may also serve to transform noncompensable value into compensable value: the longer the Government waits to condemn property X, the more it tends to abandon that property as benefitted by project A to the private market. Finally, the less foreseeable it is at the outset of project A that property X will not be needed, the more likely it is that the enhanced value is not due to the Government's special demand and its actions as condemnor, but instead is an element of fair market value that a reasonable private purchaser would pay for property X by virtue of its proximity to project A.

Regardless of how the inquiry is framed, however—whether in terms of the *Miller* test or in terms of reasonable expectations—the object is the same: to distinguish value attributable to Government demand from true fair market value of Government-conferred benefits, and to ensure that the landowner is not awarded a premium for the former but, at the same time, is justly compensated for the latter.

605 F.2d 792–93 (emphasis in original).

■ In view of the cases discussed above and the Fifth Circuit's insightful analysis in *United States v. 320.0 Acres*, I conclude that the scope of the project test should not be applied so as to exclude enhanced value from the condemnation award. The government's actions in this case place it squarely within the Fifth Circuit's discussion of reasonable expectations. Although part of this land was originally designated for inclusion in the Lost Creek project, the government's subsequent actions demonstrated that the property was outside the scope of the project; or, at least an ordinary landowner or prospective purchaser could conclude as much. In 1970 the government purchased only the lower part of tract 203, promising to construct access points for the remainder of the Eastmans' property. At the time of this transaction, the government agents also showed the Eastmans where the reservoir boundary and final taking line would be. It is thus clear that the "government representations" factor from *Jasper County* weighs heavily against the government here. By its actions, the government in effect "relinquished" the property as enhanced by its proximity to the project to private market forces. *See United States v. 320.0 Acres*, 605 F.2d at 793.[3]

The foreseeability factor also weighs against the government. If the project had required from the outset that land be acquired to control erosion and prevent turbidity, a different conclusion as to this factor, and as to the final result, might be compelled. In such an instance this case would be similar to *United States v. Crance*. It would have been foreseeable that the Eastmans' remaining land would be needed for this purpose and, therefore, it would have remained within the "sphere of probable acquisition." But, the need for controlling turbidity was not determined until some years after the start of the project, and, indeed, some years after the Eastmans sold the government their lower land. While the project always included water quality control as one of its purposes, this goal was to have been obtained simply from the dam and reservoir as originally designed.[4] It was not anticipated that sur-

---

**3.** Although the Ninth Circuit has not yet had occasion to consider the Fifth Circuit's analysis in *United States v. 320.0 Acres*, the court has indicated in the past that a landowner's expectations are important in applying the *Miller* test. In *Calvo v. United States*, 303 F.2d 902 (9th Cir. 1962), the court held that *Miller* did not require exclusion of enhanced value under the facts of that case. The court's reasoning in part was that "[n]o landowner . . . could be expected to know that his land was within the 'project.'" 303 F.2d 908.

Reasonable expectations may be especially important in this case because the first transaction between the government and the Eastmans was a negotiated sale, not a condemnation action. Mrs. Eastman testified that they agreed to the 1970 sale price of $625,000, less than their original asking price, because they were counting on the benefits they would receive to their remaining land. Not accounting for reasonable expectations in the second taking would, in the eyes of the landowners, be de-

priving them of the benefit of the bargain struck with the government.

**4.** The project functions for the Lost Creek Reservoir were described in House Document No. 566 as follows:

Lost Creek Reservoir would be operated, with Elk Creek Reservoir, to provide flood control, irrigation, future water supply, fish and wildlife enhancement, *water quality control*, hydroelectric power generation, and recreation benefits. Irrigation and wildlife enhancement benefits would depend on construction of the related irrigation distribution system to serve lands in the Medford Division as proposed by the Bureau of Reclamation. Future water supply benefits would depend on provision by the user of facilities for taking water under appropriate repayment contract. Power-generation benefits would depend on provision by a purchaser or distributor of necessary connections and transmission facilities. Flood control, fishery

rounding lands would need to be condemned to protect water quality. After learning of the possible turbidity problem, it was approximately four years before the Corps concluded it would be necessary to take additional land to control the problem.[5] The most astute and informed landowner surely could not have foreseen that land would be needed to control erosion until after the Corps had reached such a conclusion.

The length of time between the commencement of the project and the taking at issue here was not, in relative terms, particularly long. Acquisition of land for the Lost Creek project began in 1968; the remainder of tract 203 was not taken until 1975. But, there was apparently sufficient time for the market value of the Eastmans' property to rise. This increase in value was not derived from any anticipated government demand; on the contrary, all indications were that the government would not need the Eastmans' remaining land. The rise in the property's market value resulted from its proximity to the government project. In such circumstances, it is not unjust to allow the Eastmans to recover compensation for this increased value. *See United States v. 320.0 Acres*, 605 F.2d at 793.

Utilizing the *Jasper County* factors, I conclude that the Fifth Circuit's "reasonable expectations" test requires that en-

hanced value be an element of the Eastmans' condemnation award in this case. I also conclude that the same result is required under the more traditional scope of the project test. As the decision in *Jasper County* itself points out, the three factors identified in *Jasper County* are relevant to the traditional scope of the project inquiry. Therefore, under the same reasoning discussed above, the remainder of tract 203 was not within the scope of the project and enhanced value may be considered as an element of compensation for its taking.[6]

The foregoing constitutes Findings of Fact pursuant to Rule 52; if either side believes other, additional or different findings or conclusions are necessary or desirable, it should submit such proposed findings and/or conclusions within 30 days.

CONCLUSION

The government's request that evidence of enhanced value be excluded from the jury trial is denied.[7] The jury may properly consider enhanced value in determining just compensation.

It is so ORDERED.

---

enhancement, *water quality control*, and recreation benefits *would be realized by virtue of construction and planned operation of the project as described herein.*
H.R.Doc.No.566, 87th Cong., 2d Sess. 56 (1962) (emphasis added). The description of the project in House Document No. 566 did not include any reference to the need to take lands adjoining the reservoir for erosion or turbidity control.

5. In 1969 it was first brought to the attention of the Corps of Engineers that the Lost Creek Reservoir might suffer from a turbidity problem. Between the years 1969 and 1973, a number of letters and documents from inside and outside the Corps discussed the possible turbidity problem. A turbidity study for Lost Creek Reservoir was written in March 1972. (Govt. ex. 24.) However, neither this report, nor another turbidity report dated April 1972 (Govt. ex. 25), indicated that land surrounding the

Lost Creek Reservoir would have to be taken to control the turbidity problem. The Corps did not determine until sometime in 1973 or 1974 that additional land would be needed.

6. In asserting that the remainder of tract 203 is within the scope of the project, the government relies on the Ninth Circuit case of *United States v. 31.43 Acres of Land, More or Less, In Whitman County, Washington*, 547 F.2d 479 (9th Cir. 1976). That case is distinguishable from this one. In *Whitman County*, the second taking was for a purpose which was "always included" in the project plans. In this case, the taking of land to control erosion and turbidity was not always a part of the Lost Creek Reservoir project.

7. Because I dispose of the case on these grounds, it is unnecessary for me to consider the Eastmans' estoppel contentions.