William A. Mansfield, Medford, Or., for defendants.

UNITED STATES of America, Plaintiff,

v.

EASTMAN, et al., Defendants.

Civ. No. 75-1158 ME.

United States District Court, D. Oregon.

Dec. 28, 1981.

OPINION and ORDER

JAMES M. BURNS, Chief Judge.

The issue in this condemnation case is the amount of compensation to be awarded the Eastmans for their land located near the Lost Creek reservoir on the upper Rogue River. The property is about 35 miles northeast of Medford. It consists of 225 acres with a generally south to north downward slope, lying south of the Rogue River a distance of approximately ½ to one mile.

In 1970 the government acquired all of one Eastman tract (approximately 440 acres) plus approximately one-third of the subject tract (110 acres). Subsequently, the government concluded it was necessary to acquire the remainder of the second Eastman tract consisting of 225 acres.

In August, following an extensive hearing concerning the applicability of the "scope of project" rule, I held that the land was entitled to be appraised for just compensation purposes, including project enhancement. (The government had argued, in the earlier hearing, that project enhancement should not be considered.) *U.S. v. Eastman,* 528 F.Supp. 1177 (D.Or.1981). As a result, the award described in, and fixed by, this order results in an increased value stemming from the presence of the Lost Creek reservoir. This issue offers the chance that the government will appeal and presents at least the possibility of reversal.

To foster the finality of the matter in the event of appellate review, I agreed to prepare a second set of findings, which would set forth an alternative amount, arrived at without reference to enhanced value. Therefore, this opinion offers a dual set of findings. The first represents compensation reflecting project enhancement; the alternative assumes that project enhancement should not be allowed. In this fashion, if the Court of Appeals reverses my preliminary ruling, it may then evaluate the correctness of the alternative finding. Both findings seek the same goal: to determine the fair market value of the subject property in terms of the highest and best

use, which, in this case the parties agree, consists of rural recreational homesites. While enhanced value is significant, it is not the cornerstone of this award.

▮ Determination of fair market value is, of course, an attempt to meet the "willing buyer and willing seller" test. In short, it must be assumed that both buyer and seller as of the relevant date are willing, but not obliged, to buy or sell; each must be reasonable and knowledgable as to the highest and best use of the property; each must be presumed to be acting in light of facts, circumstances, and conditions known or reasonably knowable at the time of the taking, in this instance December 18, 1975. In this instance, application of this rule centers about the two most important and striking factors in this case, namely, the number of available homesites on the subject property and a determination of the most comparable property and the necessary adjustments so as to derive a value for subject property.

The applicable zoning laws at the time of the taking, December 18, 1975, required a minimum five-acre size for homesites. Each homesite was required to have an approved septic system. Hence, septic capacity governs the number of homesites, and powerfully influences the value of the land. The government's evidence showed that because of the lack of septic tank sites, only four homesites were available. This was due to the quality and condition of the soils on the property. The landowners contend that, through imaginative techniques, at least 20 and perhaps as much as 40 homesites could be located on the property.

With respect to site capacity, I find that as of December 18, 1975, four homesites were possible. This finding is based on a careful review of all the evidence, but depends primarily on the reports and testimony of Mr. Rahe. His conclusions, as to quality of the soil, the availability of septic systems and the restrictions imposed by the DEQ are much more persuasive than the contrary conclusion offered by defendants. Rahe challenged in comprehensive and convincing fashion, defendants' claim that experimental techniques such as "mounds" or "intermittent sand filter" septic systems would substantially increase the number of sites available.

My own extensive walk-through of the property before taking testimony assists me in reaching this view of Mr. Rahe's observations. Accordingly, the evidence clearly preponderates that only four homesites would have been contemplated by a prudent and knowledgable purchaser (and seller) at the time of the taking.

Mr. Vandegrift, for the government, gave his opinion that the value of the property taken was about $137,062. This included an award of $20,500 for the timber. Mr. Fromme, for the government, gave his opinion that the value of the land was $139,800, including the timber. Mr. Paget, for the landowners, estimated the value at $338,000, based upon 20 homesites. However, he subsequently reduced that figure to $225,000 when he was asked to assume availability of only four homesites on the entire 225 acre tract.[1]

Evidence from both sides to the comparable sales upon which they largely relied was of relatively little assistance. In addition, as is frequently the case, the experts on each side differed substantially in the values which they expressed as to fair market value. Further, none of the experts relied (at all, or significantly) upon a comparison between subject property and the 1970 sale from Eastman to Strickland, which I find to be the most comparable sale. Many of the comparables used and relied upon by the experts were only minimally comparable, in substantial part because they came from entirely different locations. As shown by the testimony of the government's appraisers, some were from Coos County, a sizeable distance away from the subject property; others from Lane County, even farther away. A big share of those relied upon by the landowners' appraiser, Mr. Paget,

1. The parties were in agreement as to the amount and value of the merchantable timber, both appraising it at $20,500. Mr. Paget's analysis suggested, however, that no separate value for the timber would be assigned, since purchasers would likely retain it as a desired amenity for the homesites which would be established.

stemmed from sales in California, quite some distance away and under quite different circumstances. Significant differences as to location, size, topography, market area, and recreational potential existed between most comparable sales and the subject property. This makes comparison extremely shaky because of the necessity of substantial adjustments required between the comparable and the subject. Thus, I focus largely upon the Strickland sale, even though it occurred in 1970.

Appraisers in general, when arriving at a value for subject property, will select the value for a given sale they believe to be somewhat comparable. Adjustments will then be made up or down, depending upon such factors as time of sale, size of parcel, location, topography, and other such variables. For example, if the comparable sale occurred one year before the taking of the subject property and during a period of rising prices, the appraiser will adjust upward, that is, he will derive a value (either on a per-acre or per-parcel basis) for the comparable. This will be adjusted in accord with the percent by which sales of that kind of property increased over the period of time between the two relevant dates. By way of further example, if the comparable is a smaller parcel than the subject property, in general a downward adjustment is made. This is on the basis that, all other things being equal, smaller parcels bring a higher per-acre price than larger parcels because the total dollar price is less and more potential buyers exist for a lower rather than higher priced piece of property. Other adjustments reflect other factors.

The price paid for the Strickland parcel was $57,700 or $555 an acre. The parcel consists of 104 acres adjacent to the subject tract which it resembles in topography and terrain. The chief difference lies in subdivision potential. Since the subject property lacks the Strickland potential for development, therefore it cannot command the same per acre price. However, while adjustments must be made for this difference as well as time, size and other relevant factors, the parcels share characteristics sufficiently similar to provide the most accurate comparison available.

Initially, the comparison requires an adjustment for the time difference between the two sales. The Strickland sale occurred in mid-1970; the subject property is dated from December 18, 1975. Therefore, a substantial upward adjustment must be made to relate the two transactions.

There was little disagreement between the appraisers that between 1970 and 1975 the value of property in that area increased by a rate of about 13% annually (compounded). To bring the Strickland sale to a value equal to December 18, 1975, therefore, I utilize a factor of 1.84 representing a 13% per annum compounded. (This factor was offered in the government's final argument and was not seriously challenged by defendants.) When applied to the amount per acre of the Strickland sale, $555, this provides a basis for $1,021.10 an acre for subject.

This amount, $1,021.20, must be reduced, however to reflect the substantial difference in site capacity and parcel size. A knowledgable purchaser would tailor his offer to the number of available homesites. Subsequent sales by the Stricklands to third parties show at least seven homesites exist on the Strickland property. Accepting the four-site capacity of the Eastman property, the value is adjusted downward by a ratio of 4:7. Applying this factor, I arrive at a reduced value of $583.52 per acre. This factor also properly reflects, as well, the downward adjustment for the difference in overall size—the subject being slightly over twice the size of the Strickland parcel.

■ An added adjustment is needed to reflect the Eastman property's greater accessibility and better scenic view value for homesites. This results in an upward adjustment of 10%, representing a 5% increase for accessibility (public road and proximity to the reservoir) and 5% for slightly better view sites, adding an additional $58 per acre for a total of $623 per acre, rounded to $625. This makes the value of the land on subject property $140,625.00. Added to this is the sum of $20,500 for the value of marketable timber. This results in a final total of just compensation in the sum of $161,-125.00.

As an alternative award, absent any consideration of project influence,[2] I find value to be $145,125.00.

Project enhancement, in the view of the appraisers, and I join in this view, plays only a very modest role here. This is because the "view" value of the property would have been significant even if Lost Creek Project had never been undertaken. The Rogue River, in its undisturbed and pristine state, was capable of being seen from some of the sites on which building capability existed (as is true of at least one, and perhaps more, of the sites on Strickland). While some of the appraisers suggested that project enhancement played a part in the price paid by Strickland, it seems clear that such was a small part. My findings reflect this.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52; that portion following page 1187, line 1, will be $145,125.00 only if this case is appealed and the Court of Appeals concludes that my ruling on project enhancement is in error.

---

2. The value opinions expressed by the appraisers absent project influence are as follows:

| | |
|---|---|
| Fromme: | $110,500 |
| Vandergrift | 118,500 |
| Paget | |