**UNITED STATES of America, Plaintiff,**

v.

**13.20 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF LINCOLN, STATE OF WASHINGTON; Stanley G. St. Jeor, et ux.; et al., 5.03 Acres, Etc.; Barbara Olson Hoover, et al., 4.87 Acres, Etc.; A. Russell Rosenberg, et al., Defendants.**

**No. C–85–031–JLQ.**

United States District Court, E.D. Washington.

Jan. 16, 1986.

Robert M. Sweeney, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Kenneth Carpenter, Davenport, Wash., for defendants.

MEMORANDUM OPINION AND ORDER RE: SCOPE OF PROJECT AND NAVIGATIONAL SERVITUDE DOCTRINE

QUACKENBUSH, District Judge.

BEFORE THE COURT is the United States' Motion *In Limine* Concerning Valuation of Lands In Connection With Navigable Waters of the United States (Ct.Rec. 16), Motion to Establish Larger Parcels (Ct. Rec. 17), and a Supplemental Motion *In Limine* for Pretrial Rulings Concerning Scope of the Project Rule and Navigational Servitude Doctrine (Ct.Rec. 28), heard with oral argument on December 20, 1985. The United States was represented by Assistant United States Attorney Robert Sweeney; defendant landowners were represented by Kenneth Carpenter. The court having reviewed the records and files herein, having considered the oral and written argument of counsel, and being fully advised in these matters, rules that the scope of the project rule does not apply to the property in question and that the navigational servitude valuation statute, 33 U.S.C. § 595a, does apply to the landowners' remaining parcels. This ruling is set out more fully below.

## FACTUAL BACKGROUND

The government's project involved in this case was authorized by Congress in 1935. Grand Coulee Dam was begun in 1935, and completed in 1941, with filling of the reservoir, Lake Roosevelt, being completed in 1942. Preliminary to the actual construction of the project, the Interior Department had been investigating lands which the government felt it needed for the project, and in 1934 the Department filed with the Washington Commissioner of Public Lands a list of state-owned lands that would be needed if the project obtained approval. This was done pursuant to R.C.W. 90.40.-050, part of the state's 1905 Irrigation Code. The properties in question were part of that filing, being within the total of the 120 acres of part of the Northwest quarter of Section 16, T.28 N., R. 31 E.W.M., Lincoln County, listed by the Department.

This was a section of the school endowment lands granted to the State of Washington under the State Enabling Act.

In 1943, the State of Washington conveyed the north half of Section 16 to Julius C. Johnson, with no reference being made to the Department of the Interior's 1934 filing. The Johnson family has retained some of these lands at issue and have conveyed some. Over the years, the land has been used almost exclusively for livestock grazing, except that some improvements have been made, such as land leveling on St. Jeor's land.

While the government did not institute condemnation until January of 1985, the court notes that in 1944, the Department of the Interior did file a notice of Definite Description with the State Land Commissioner, pursuant to R.C.W. 90.40.050. This notice identified 28.8 acres, including the 23.1 in question here. Also, in 1958, the Interior Department filed a notice with the State Land Commissioner indicating that the Department was of the opinion that because of R.C.W. 90.40.050's provisions, the government considered that it was owner of the property here in question. However, no condemnation action was taken. In 1968, Chief Judge Powell of this district, in a case not involving these specific lands, found R.C.W. 90.40.050 to be invalid, since it purported to allow the State of Washington to transfer lands to the government without compensation. *United ed States v. 111.2 Acres in Ferry Cty., Wash.*, 293 F.Supp. 1042 (E.D.Wash.1968), *aff'd.* 435 F.2d 561 (9th Cir.1970). At that time it became clear the government had no interest in the lands in question under the provisions of R.C.W. 90.40.050. Despite this ruling, condemnation proceedings did not commence until 1985.

## SCOPE OF THE PROJECT

The "scope of the project" rule may be traced to *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). The test of just compensation as stated in *Miller* is:

The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities.

*Id.*, at 377, 63 S.Ct. at 281. *Miller* dominates the courts' analysis of just compensation questions involving government projects such as herein involved. *See United States v. Reynolds*, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); *United States v. 31.45 Acres of Land*, 376 F.Supp. 1277 (E.D.Wash.1974), *rev.* 547 F.2d 479 (9th Cir. 1976).

It is clear, however, that *Miller* is not the end of the court's inquiry into just compensation. Rather, it is just the beginning point, and in difficult cases *Miller* does little more than restate the problem. *United States v. 320.0 Acres of Land, More or Less, in the County of Monroe, State of Florida*, 605 F.2d 762 (5th Cir.1979) ("*Monroe*"). The inquiry here must delve into the reasoning and policy considerations behind the *Miller* doctrine. The basic premise is the Constitutional mandate of just compensation in eminent domain proceedings. The government must pay a fair amount for lands taken, but it should not have to pay an additional amount as a result of its own project. *Monroe, supra* at 780. On the other hand, the landowner has a basic right to the highest and most profitable use of his land. While it is not just or fair for landowners to profit from the government's project, once that project is in place, the landowner should be able to develop any property the government has not taken to its fullest use, in light of the project. The landowner reasonably expects to be able to make the highest and best use of his land, an expectation that is based on the marketplace.

Where the project changes in form or scope, where errors require further or different land condemnation, or where completion of the project takes an inordinately long time, the "scope of the project" inquiry must be made with careful judicial discrimination. *See Reynolds, supra*, 397 U.S. at 21, 90 S.Ct. at 807–08; *United States v. Eastman*, 528 F.Supp. 1177 (D. Oregon 1981), *aff'd and opinion adopted*, 714 F.2d 76 (9th Cir.1983) ("*Eastman*"). But,

> [r]egardless of how the inquiry is framed, however—whether in terms of the *Miller* test or in terms of reasonable expectations—the object is the same: to distinguish value attributable to Government demand from true fair market value of Government-conferred benefits, and to ensure that the landowner is not awarded a premium for the former but, at the same time, is justly compensated for the latter. (Footnotes omitted).

*Monroe, supra* at 793.

In *United States v. 62.17 Acres of Land, Etc., in Jasper Cty.*, 538 F.2d 670 (5th Cir.1976) ("*Jasper*"), the Fifth Circuit set forth three factors for assessment of application of the scope of the project rule. These factors were adopted in *Eastman, supra*, 528 F.Supp. at 1180:

> (1) the foreseeability of any change in the project so that the property in question might be included; (2) the length of time between the commencement of the project and the condemnation of the property in question; and (3) the Government representations concerning the finality of the project as announced.

In *Eastman*, following an analysis based upon these factors, the court concluded that the scope of the project did not apply to the second taking of the land. While the case before this court does not involve a second taking, as in *Eastman*, the *Jasper-Eastman* analysis provides assistance in resolving this problem. These factors al-

low a proper consideration of the *Miller* doctrine, in light of the reasonable expectations of the landowners.

The factors as used in this court's analysis are stated as follows: (1) the foreseeability that the property in question would ever be included in the project; (2) the length of time between the commencement of the project and the condemnation of the property in question; and (3) the government's representations concerning the finality of the project as announced. In this case, it will become apparent that all three factors are closely interrelated.

In the case before this court, there is no issue of a second taking, and there is no doubt that at least a portion of the property in question was within the original scope of the project. Thus, the emphasis in factor number one shifts from that of whether or not the project might change so as to include these properties, to whether these properties would ever be purchased by the government and incorporated into the project. Since this shift in analysis occurs, the threshold question is by whom was purchase of the lands by the government foreseeable. That is, at what point in time during the last fifty years should foreseeability of condemnation be determined?

The court is faced with three choices regarding when foreseeability is to be charged: that point in time at which Mr. Johnson purchased the land from the State of Washington; or the time when the present owners acquired the properties; or the time of condemnation by the government. Obviously, this determination will color the rest of the analysis. When Mr. Johnson purchased the land in 1943, the property was clearly within the scope of the project. The project—Lake Roosevelt—was only eight years old. If the determination is to be made at the various times when the present owners acquired their interests, the issue is far less clear. The court concludes the proper time frame for the foreseeability issue is the time of actual condemnation. This point in time is consistent with the inquiry that must be made regarding factor two, the length of time between project commencement and the property condemnation. It also comports with an analysis of the reasonable expectations of the property owners, as those expectations are connected as much to continued alienability and future use as to initial purchase price. Finally, factor three can be related more clearly, as all three factors will span the same time period.

It cannot be fairly held that these landowners, in 1985, were reasonably able to foresee the government's acquiring the properties in question. Their perspective would be as follows: The Dam was begun in 1935, fifty years prior. While the government has made claims of ownership of the property as previously noted, until now, no condemnation has been initiated. While notices were filed in 1934 with the State, the State's deed to Johnson made no mention of any government acquisition rights. The lands have been used continuously since 1943, without government interference of any sort. True, another notice was filed in 1958, stating that the government owned the property, but no personal notice was given the landowner. Further, no agent ever attempted eviction, fencing off the land, or even to bill these people for livestock grazing rights. In 1968, the government's putative interests were declared null and void. Even after losing whatever interests it claimed, the government did not come forward to condemn, as surely it would if it wanted ownership.

The only countervailing perspective is the question—surely a less nagging one as time went on—as to why these lands were the only shorelands not condemned. Given this long history of inaction, it cannot be said that the government's condemnation action, at this late date, was foreseeable. One can reasonably foresee changes in finalizing a project, even when the span is several years, but foreseeability dims when it must be passed from generation to generation.

These landowners can trace clear title from 1943. The project was begun in 1935, fifty years ago. Factor two, involving the

length of time between the commencement of the project and the present condemnation, weighs heavily against the government. The passage of time in this case goes far beyond being a minor limiting factor, as noted in *Jasper, supra* at 680. There, the court said that whether a delay from 1965 to 1971 was such that it might constitute a representation to the landowner that the property would not eventually be taken was a consideration for the court on remand. In *Monroe, supra* at 797, the court admonished the government for a delay of 18 years, stating:

> But even in this situation [where there was no question the property was within the original scope of the project], where the Government defines the bounds of a project and announces its intent to acquire *eventually* lands within those project bounds, there comes a point in the passage of time when it no longer would be just to apply the SOP (scope of the project) rule in the Government's favor." (Emphasis in original).

Here, not only has the government made no assertion that it would eventually condemn these lands, as in *Monroe*, but fifty years have passed. By insisting the scope of the project rule be applied in its favor, the government is saying it has the unencumbered right to deepfreeze these lands. As succinctly stated in *Monroe, supra* at 797, "[w]ithout any limits on the temporal reach of the SOP [scope of the project] rule, the Government could encumber the free use and marketability of private property indefinitely simply by announcing a project and its intent to condemn property for that project some time in the future." The government's series of notices in 1934, in 1944, and again in 1958, indicate that it might "eventually" take the lands. This sort of inaction is an unconscionable exercise in inverse condemnation, spanning, as it does, fifty years.

These assertions by the government also relate to factor three, concerning the finality of the project as announced by the government. The lake reached its intended level, MSL 1290, in 1942. At that level, approximately 7 acres of the land constituting part of the original parcel were inundated. A small portion of the 23.1 acres being condemned in 1985 is at or below the 1310 MSL level, stated by the government to be its desired freeboard area. In spite of the inundation of part of these lands, and the attainment of the 1290 MSL level by the lake, the government has never condemned the property in question. There is no evidence in the record that shows the project being substantially changed so as to require acquisition of all of the property in question, including that above 1310 MSL. The lake having reached its optimum level of 1290 feet in 1942, together with the completion and long-standing operation of the dam and its power-producing equipment, all tend to show the project was final and complete. Condemnation of other shorelands did take several years. Some of these acquisitions were under the aegis of R.C.W. 90.40.050, however; when that statute was declared invalid in 1968, the government still did not move to condemn the property here in question. That represents the passage of another seventeen years, about as long as the time span noted in *Monroe* as exceeding a reasonable time for condemnation.

It is clear to this court that the property owners cannot be charged with being able to foresee government acquisition, fifty years after inception of the project, especially where that project underwent no major changes requiring their lands. This span of time, fifty years, argues against the government's assertion that the scope of the project should be applied in its favor. The government's inaction in the face of caselaw and its lack of follow-up to the various notices filed with the state—weigh against the government, and in favor of a determination that for the purposes of this case the project has been complete for a considerable time. Therefore, this court determines that the subject property is no longer within the scope of the project. The rule announced in *Miller* will not be applied to these property owners, and the value of just compensation must be measured by current market value of the property, tak-

ing into consideration the value as enhanced by the proximity of Lake Roosevelt. *See United States v. Fuller,* 409 U.S. 488, 492, 93 S.Ct. 801, 804, 35 L.Ed.2d 16 (1973).

### EFFECT OF 33 U.S.C. § 595a

The ruling as to the valuation of the condemned lands does not apply to the several, remaining parcels. The remaining lands are clearly governed by statute. 33 U.S.C. § 595a. That statute states in part:

> In cases of partial takings of real property, no depreciation in the value of any remaining real property shall be recognized and no compensation shall be paid for any damages to such remaining real property which result from loss of or reduction of access from such remaining real property to such navigable waters because of the taking of real property or the purposes for which such real property is taken.

This section of the statute is a caveat from the preceeding sentences thereof which in essence abrogates the doctrine of non-compensation for riparian access found in *United States v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1st Cir.1967). However, as provided by § 595a, no severance damages may be awarded for loss of access from the remaining lands to the water.

In view of the holding by the Supreme Court in *Rands* that no compensation is owed by the United States for loss of access to navigable waters, the defendant's claim that the portion of 33 U.S.C. § 595a prohibiting the award of damages for termination of riparian access to the remaining parcels is unconstitutional is without merit.

### CONCLUSION

Based upon the above opinion, the court rules:

1. The scope of the project rule will not be applied to the land condemned by the government in this action. Therefore, just compensation valuation must include current market value of the condemned parcels, taking into consideration the access to Lake Roosevelt.

2. 33 U.S.C. § 595a will apply to the valuation of the remaining parcels, and severance damages regarding those parcels will not include loss of access to Lake Roosevelt.

3. 33 U.S.C. § 595a is not unconstitutional.

Finally, the court recognizes and hereby finds that this opinion involves a controlling question of law as to which there is substantial ground for difference of opinion and will control the trial issues in this case. The court further finds that an immediate appeal from this Order would materially advance the ultimate termination of this litigation. Therefore, the court certifies this decision and Order to the Ninth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b). The attention of counsel is called to the fact that the petition for discretionary review of this Order, if desired, must be filed with the Ninth Circuit Court of Appeals within ten (10) days from the date of this Order.

IT IS SO ORDERED.