UNITED STATES of America, Plaintiff-Appellee,

v.

49.01 ACRES OF LAND, MORE OR LESS, SITUATE IN OSAGE COUNTY, STATE OF OKLAHOMA, I.D.S. Mortgage Corporation, and Industrial Western Inc., Defendants,

Alexander-Frates Co., a Corporation, Diamond Head Property Owners Association, Inc., a non-profit Corporation, and Diamond Head Development Section 2, Osage County, Oklahoma, Defendants-Appellants.

No. 83–2195.

United States Court of Appeals, Tenth Circuit.

Sept. 30, 1986.

J. Thomas Lenhart (Pamela H. Anderson, also of Shaw, Pittman, Potts & Trowbridge, Washington, D.C., and F. Paul Thieman, Jr. of Thieman & Kronfeld, Tulsa, Okl., with him on the briefs), for defendants-appellants.

Robert L. Klarquist, Atty. (F. Henry Habicht, II, Asst. Atty. Gen. and Donald T. Hornstein, Atty., also of the Dept. of Justice, Washington, D.C., Hubert H. Bryant, U.S. Atty., and Hubert A. Marlow, Asst. U.S. Atty., Tulsa, Okl., with him on the briefs), for plaintiff-appellee.

Before LOGAN, McWILLIAMS, and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

Landowners have appealed a district court ruling that our decision in a related condemnation case, *United States v. 49.01*

*Acres of Land,* 669 F.2d 1364 (10th Cir. 1982) (hereafter *Anderson*), controls the instant case. We there held that the owners of the land known as the Anderson Unit were not entitled to the enhanced value of their land attributable to construction of the Keystone Dam and Reservoir. The land at issue in the instant case, 0.6 acres on which a flowage easement was taken, was originally included in the *Anderson* litigation, but was severed from that action by order of the district court on the government's motion, because of different factual circumstances of ownership and development. The land at issue here (hereafter the Frates Unit) is owned by Alexander-Frates Co., Diamond Head Property Owners Association, Inc., Diamond Head Development Section 2 and IDS Mortgage Corporation (hereafter collectively Alexander-Frates). While we conclude that we must reach the merits of Alexander-Frates' claim for the enhanced value of the Frates Unit, we do not find that the factual distinctions between *Anderson* and the instant case warrant a different result here. Accordingly, we affirm the district court's conclusion that the enhanced value of the Frates Unit attributable to the Keystone project should not be considered in arriving at just compensation for the taking.

This dispute arose from Congress' decision in 1950 to construct the Keystone Dam and Reservoir on the Arkansas River in Oklahoma. In 1959 the Tulsa District Corps of Engineers issued a design memorandum which designated the Frates Unit as being within the Keystone project. This memorandum provided for a conservation pool of 723.0 feet, a flood control pool of 754.0 feet, and a flowage easement to 759.0 feet above mean sea level (m.s.l.). *See Anderson,* 669 F.2d at 1366. "The Corps estimated that floods would inundate land up to 754 foot level once every five years and land to the 759 foot level once every fifty years." *Id.* at 1366 n. 2. All the Frates Unit land at issue in this condemnation case is situated below 759 feet m.s.l. Stipulation 29. In September 1964 the Keystone Lake dam was closed and the reservoir filled to a level of 723 feet m.s.l., which was well below the Frates Unit land.

In August 1972 Frates Properties, Inc. became a fifty-percent owner of the land at issue here. Alexander-Frates assert that an inspection before the purchase "revealed that the highwater mark was many feet below the subject land and that the Corps had erected boundary markers to delineate the Government's land which clearly excluded the subject land." Appellants' Opening Brief at 9. After this purchase, Alexander-Frates began condominium development. Alexander-Frates obtained government permission to build a highway on the land that affected drainage into Keystone Lake and to lay a waterline to the development across government property. In addition, the government approved the Alexander-Frates' development plans for "the construction of the roads, installation of sewer and water lines and condominium units along the steep hillsides of the property." Stipulation 19C.

After these approvals, construction of the condominiums began. On November 7, 1974, however, the level of Keystone Lake was allowed to rise to 754.86 feet m.s.l. because of heavy rains. Water reached several of Alexander-Frates' roads, service lines, and condominium foundations. Although the government had provided for a flood control pool of 759.0 feet m.s.l., this was the first time the reservoir had been allowed to approach that level. On January 28, 1975, the government instituted formal condemnation proceedings against the Anderson and the Frates Units.

I

■ The government asserts that our decision regarding the Anderson Unit controls the disposition of the instant case for two reasons. First it contends that the doctrine of the law of the case bars Alexander-Frates from asserting entitlement to the enhanced value of the Frates Unit land. However, the law of the case applies only to different proceedings within the same litigation. *See, e.g., United States v. Williams,* 728 F.2d 1402, 1405–06 (11th Cir.

1984); *Peques v. Morehouse Parish School Board,* 706 F.2d 735, 738 (5th Cir.1983). Here, once the litigation over the Frates Unit was severed from litigation over the Anderson Unit, the cases proceeded independently. Thus the law of the case doctrine is inapplicable.

The government also contends that Alexander-Frates are estopped from arguing that the *Anderson* decision does not control the instant case. Alexander-Frates asserted in a motion to intervene in *Anderson* that "[t]his Court's determination of the 'scope of the project' issue in this appeal will be determinative of such issue in Petitioners' case presently pending in the District Court." Appellee's Brief, Addendum at 9. After being denied intervention, Alexander-Frates repeated this assertion in their amici curiae brief. Appellee's Brief, Addendum at 12.

■ Although framing its argument in general estoppel terms, the government in effect has invoked the doctrine of judicial estoppel. Judicial estoppel bars a party from adopting inconsistent positions in the same or related litigation. *See generally* 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.405[8] (2d ed. 1984). Courts adopting this doctrine have reasoned that it is necessary to protect the integrity of the judicial process. *See, e.g., Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1166–67 (4th Cir.1982); *Sacarno v. Central R. Co.,* 203 F.2d 510, 512–13 (3d Cir.1953).

The Tenth Circuit, however, has rejected the doctrine of judicial estoppel. *Parkinson v. California Co.,* 233 F.2d 432 (10th Cir.1956). We reasoned that "[e]ven in the case of false statements in pleadings, public policy can be vindicated otherwise—and more practicably and fairly in most instances—than through suppression of truth in the future." *Id.* at 438. We also declared that adoption of judicial estoppel "would be out of harmony with the great weight of authority independent of that rule, and would discourage the determination of cases on the basis of the true facts as they might be established ultimately." *Id.; ac-*

cord *Konstantinidis v. Chen,* 626 F.2d 933, 938 (D.C.Cir.1980).

■ Even if we were not bound by our *Parkinson* decision, we note that most courts that have adopted judicial estoppel bar a party from presenting an inconsistent assertion in subsequent litigation only if that party succeeded in the earlier litigation. *See, e.g., Edwards v. Aetna Life Insurance Co.,* 690 F.2d 595, 599 (6th Cir. 1982); *Konstantinidis,* 626 F.2d at 939; *Sacarno,* 203 F.2d at 513. They conclude that the integrity of the court is not threatened if the court failed to adopt the party's prior position. *See, e.g., Edwards,* 690 F.2d at 599. That is the case here. Alexander-Frates' motion to intervene in *Anderson* was denied. They were allowed to file a brief as amici curiae, but their argument supporting the Anderson Unit owners was rejected. Thus, Alexander-Frates' assertions in their motion to intervene and in their amici brief do not bar them from adopting an inconsistent position in this litigation. Neither the doctrine of the law of the case nor the doctrine of judicial estoppel bars our reaching the merits of Alexander-Frates' appeal.

## II

■ Turning to the merits of Alexander-Frates' claim of entitlement to the enhanced value of the Frates Unit, in *Anderson* we set out the standard for an award of enhanced value:

"If a landowner's property increases in value because of the government project, the government need not pay this enhanced value unless (1) the property was not within the original scope of the project; or (2) the government failed to provide the public with adequate notice of the project's scope; or (3) the landowner reasonably believed that subsequent government action removed the property from the project's scope."

669 F.2d at 1367 (citations omitted). We concluded that the Anderson Unit owners were not entitled to the enhanced value of their land because that land was within the

original scope of the project, and we held that a public notice of the government's intent to take certain land puts the owners of that land on notice, regardless whether there had been individual notice to them. *Id.* at 1368.

The parties here stipulated that the land at issue in this case was within the original scope of the project. Stipulation 29. Alexander-Frates contend, however, that they did not have adequate notice of the government's intent to condemn their land. Their attempt to distinguish their position from that of the landowners in *Anderson* in this respect is unpersuasive. In *Anderson* we explicitly held that the 1959 design memorandum "should have placed the existing, and subsequent landowners on notice that the government would *probably* take their property,...." 669 F.2d at 1368 (emphasis in original). In addition, we noted that adjoining landowners bear a heavy burden in showing lack of notice and that the government need not notify the landowners individually of an intent to take their property. *Id.* Alexander-Frates had sufficient indication that their property was within or sufficiently close to a government project to reasonably require them to inquire precisely what the status of their land was. Indeed, it was the land's very proximity to a government project that made it such an attractive investment to these developers.

### III

In *Anderson,* we also rejected the Anderson Unit owners' arguments that the government's ten-year delay in condemning the land and its statements that acquisition of land was complete justified a reasonable belief that their land was no longer within the scope of the project. We concluded that the following factors outweighed the landowners' assertions: (1) the government's original 1959 statement included the Anderson Unit land; (2) a 1965 mapping correction included the Anderson Unit within the project; (3) negotiations for purchase of the Anderson Unit land continued through 1969; and (4) some of the Ander-

son Unit land had been underwater since 1964. *Id.* at 1369.

Alexander-Frates contend that the following factual distinctions from *Anderson* warrant a different result in the instant case: (1) Corps markers and treelines indicated that the Frates Unit land was not within the scope of the project; (2) unlike the Anderson Unit land, none of the Frates Unit land was underwater before 1974; and (3) on three separate occasions the Corps approved plans related to the condominium development. We find none of these distinctions persuasive.

■ Reliance on the Corps monuments and treelines was unwarranted. The parties stipulated that "[t]he Corps Monuments were set to mark the boundary lines of U.S. Government *fee lands* only. No monuments were set to mark the boundary line of flowage easement areas." Stipulation 13 (emphasis added). Anderson-Frates were not entitled to assume that the monuments enclosed all the land subject to a government taking, including flowage easements. Because their land was within the scope of the project as defined in the original design memorandum and because the Corps had stated in that memorandum that it had a "flexible" taking policy, Alexander-Frates should have made some effort to ascertain the significance of the Corps monuments.

Nor did the fact that the Frates Unit land was not underwater when the reservoir was first opened entitle Alexander-Frates to believe that their land was outside the scope of the project. The government specifically stated in its public notice concerning the project that the reservoir could be expected to reach the 759 foot level only once every fifty years. *Anderson,* 669 F.2d at 1366 n. 2. The failure of the water to reach this level until 1974 certainly cannot be construed as government action modifying the reservoir plan. *Cf. United States v. Eastman,* 528 F.Supp. 1177, 1182, 1184 (D. Ore. 1981) (suggesting that government representation from inception of project that additional taking may be necessary would weigh against

granting of enhanced value), *aff'd per curiam*, 714 F.2d 76 (9th Cir.1983).

Finally, the Corps' approval of various aspects of Alexander-Frates' condominium development did not constitute a representation that their land was no longer within the scope of the Keystone project. One of the approvals was to allow highway access to the development, another to lay a water line across government property. The third involved showing the entire condominium development plan for inspection and approval of roads and utility lines that could affect drainage into the reservoir. Although the Corps saw the entire development plan for the thirty-six acre condominium development, we believe this does not constitute an affirmative representation that the government would not condemn the 0.6 acre of that development involved here.

This case is quite different from *United States v. 172.80 Acres of Land*, 350 F.2d 957 (3d Cir.1965), in which the landowners' received "specific government assurance that their land would not be taken." *Id.* at 959; *see also United States v. 320.0 Acres of Land*, 605 F.2d 762, 769, 793 (5th Cir. 1979) (unequivocal representation that land will not be taken warrants granting of enhanced value). The assurances received here, if they were such, were implicit and ambiguous at best. These owners ought reasonably to have asked the Corps directly about the status of their property. The government's original public declaration that once in fifty years it expected a flood to cause the reservoir level to reach the 759 foot level is what required it to take flowage easements to that level. General approval of developers' plans, apparently based upon an erroneous assumption by both parties that no part of the development extended below 959 feet m.s.l., should not be treated as official abandonment or modification of the original project.

## IV

■ Alexander-Frates also assert the doctrine of equitable estoppel against the government, contending that the Corps' approval of the condominium development plans estops the government from now denying that it had abandoned its intent to condemn Alexander-Frates' property. The United States Supreme Court still has not ruled directly whether estoppel may run against the government in any circumstances. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *see also Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347 (D.C. Cir.1985). The Court has stated, however, that "the Government may not be estopped on the same terms as any other litigant." *Community Health Services*, 467 U.S. at 60, 104 S.Ct. at 2224 (footnote omitted). If the government is to be estopped, the most compelling of circumstances will have to be present, especially when the issue involves the expenditure of public funds. *Id.* at 63, 104 S.Ct. at 2225.

Those compelling circumstances are not present in this case. As the Supreme Court found in *Community Health Services*, we find here that Alexander-Frates' reliance on the government's possible representations, if indeed they rise to that level, was not reasonable. Alexander-Frates' failure to question the Corps directly, their decision to invest substantial sums of money on what were at best implicit and ambiguous assurances, precludes finding any estoppel in this case. *Cf. id.* at 64, 104 S.Ct. at 2226 (government cannot "be expected to ensure that every bit of informal advice given by its agents ... will be sufficiently reliable to justify expenditures as substantial as those spent" by private party).

AFFIRMED.