475 A.2d 1155

Jack L. BAYLIN et al.

v.

STATE ROADS COMMISSION of the State
Highway Administration et al.

No. 113, Sept. Term, 1983.

Court of Appeals of Maryland.

June 4, 1984.

2

Richard A. Reid, Towson (Royston, Mueller, McLean & Reid, Towson, on the brief), for appellants.

Lloyd J. Hammond, Asst. Atty. Gen., and Sp. Counsel, Brooklandville (Stephen H. Sachs, Atty. Gen., Nolan H. Rogers and William B. Tittsworth, Asst. Attys. Gen., Baltimore, on the brief), for appellee.

Argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Retired, Specially Assigned, Judge.

COUCH, Judge.

This appeal involves the question of the measure of compensation to be applied where approximately 30 years elapses between the initial design of a highway project and the ultimate taking of private property for a substantially enlarged public project. The issue now before the Court is whether evidence of enhanced value, under the circumstances present here, may be introduced at a jury trial on the issue of just compensation. We granted certiorari prior to

**4**

consideration by the Court of Special Appeals to address this issue of first impression in Maryland.

## (I)

### *The Facts*

In 1948, Baltimore County requested that the State Roads Commission develop a plan for construction of a limited access highway to service the corridor between Liberty Road and Reisterstown Road. This project (relocating U.S. Route 140, which was later termed the Northwest Expressway) was budgeted as of July 1, 1954 in the State Roads Commission's twelve year road construction and reconstruction program, published in 1952. As of 1954 the state was committed to build the Northwest Expressway which was then scheduled for completion between 1962 and 1965.

In 1957, the alignment of the Northwest Expressway was approved by the State Roads Commission. The alignment established the location of the centerline or median of the highway. Construction drawings, ground surveys, and right-of-way plats were prepared in the late 1950's and early 1960's. The construction drawings showed the location of the Northwest Expressway through appellants' property and an interchange with then existing Painters Mill Road, all of which would have required a taking of 19.32 [1] acres from appellants' property, which was a small part of the entire tract. These plans were consistent with the interchange design and location as shown on the 1957 Baltimore County Zoning Map.

The location of the Northwest Expressway was approved by the State Roads Commission and the Bureau of Public Roads in 1960.

In order to permit landowners to determine if and how the proposed Northwest Expressway would affect their property the state superimposed the proposed taking on a

---

1. Hereinafter the actual acreage of 19.32 shall be referred to as 19 acres.

plat and furnished this to landowners. Appellants' predecessor in title received such a plat showing the location of the Northwest Expressway in 1963. The taking indicated on the plat was consistent with previous construction drawings requiring 19 acres of appellants' land. However, the state noted in an accompanying letter and on the plat itself that the plans and proposed right-of-way were "TENTATIVE AND SUBJECT TO REVISION."

At about this time a federally funded study was undertaken to consider construction of the Northwest Rapid Transit line. The study was completed in 1965. One suggestion was to locate the northwest line in the median of the proposed Northwest Expressway. Subsequent studies, published in 1968 and 1970, considered this alternative favorably.

Appellants acquired the property which is the subject of this appeal in 1965. They engaged an engineer to plan the site for a regional shopping center, together with residential and industrial uses. In 1967, the engineers obtained copies of the state's tentative construction drawings for the Northwest Expressway. The plans still showed the project alignment going through appellants' property, requiring 19 acres. The state informed the engineers at that time that the plans dated back to 1959 and were very tentative. They also indicated that the Northwest Expressway and its interchange at Painters Mill Road were "under restudy and subject to change based on traffic needs, latest design criteria, and B.P.R. 1M–21–6–66." [2]

Construction of the Northwest Expressway did not begin as originally planned because funds for the project were transferred to the Patapsco Freeway in the late 1960's. Before funds could be reappropriated several things occurred affecting the construction of the Northwest Expressway. The National Environmental Policy Act was implemented in 1969. The Act subjected highway projects to

---

2. We can find no explanation in the record for B.P.R. 1M–21–6–66.

new developmental processes, including the preparation of environmental documents and the necessity for public hearings. New safety standards for highways were also adopted. In 1971 the state requested federal funding for the Northwest Expressway project. Additionally, the Mass Transit Administration was established and there were preliminary plans for the joint development of the highway project with a rapid transit facility. The 1970 Alternative Transit alignments recommended placing the rapid transit line in the median of the Northwest Expressway, with stations at Milford Road, the Beltway, McDonogh Road, and Owings Mills near Dolfield Road. This was an extension of previous work undertaken by the Metropolitan Transit Authority in 1964–1966. As a result of these events new project planning studies were commissioned in 1971.

The transit line appeared in the 1972 Consolidated Transportation Program combining a segment of the Northwest Line of the Mass Transit Administration's rapid transit facility with the Northwest Expressway.

In 1973 the first public hearing required under the National Environmental Policy Act was held in connection with the preparation of an environmental impact statement; a preliminary draft of this impact statement was available at the hearing. There were several alternatives considered for the Northwest Expressway. Alternates 1 and 2 of the statement were the same alignment of the Northwest Expressway with the interchange at Painters Mill Road which had been previously planned, requiring 19 acres of appellants' property. The other two alternates considered were to improve Reisterstown Road, including a full interchange at the Beltway, or do nothing.

The draft impact statement also considered proposals for a Rapid Rail Facility of the Mass Transit Administration. Several possible alternate routes were considered for the transit line as well as alternates for the parking facilities. Two of the alternates would have involved the taking of approximately 60 acres of appellants' property. Because of

public concerns neither alternate was adopted and the state prepared two additional alternates. These were presented at public hearings in 1974. Under both of the new alternates, the interchange and major transit station were shifted to appellants' property. However, location of the parking facility for the transit station was different. In one alternate the parking was located on appellants' property; in the other the parking was located off appellants' property.

An area included within these two alternate proposals qualified as a Historic District in 1975. This led to the inclusion of a third alternate plan, which reduced the land required from the Historic District, along with the two original alternates in the draft Environmental Statement, which was prepared and circulated in 1975. This third alternative plan required location of the parking facility on appellants' property.

This final plan was recommended for approval by the state in 1976 and was accepted by the federal government in 1977. This new plan recommended that a new road, to be known as Owings Mills Boulevard, was to be constructed through appellants' property; the major interchange of the Northwest Expressway was shifted to appellants' property so that it would intersect with this new road; the major transit station was to be located on appellants' property; the parking facilities were to be located on appellants' property; and the Northwest Expressway was shifted 900–1,000 feet to the west as it traversed appellants' property.

In 1981, the state commenced condemnation proceedings against 137.341 [3] acres of appellants' property for the construction of the Northwest Expressway and the Mass Transit facilities. There had been no prior acquisition of appellants' property, although other property was acquired as early as 1955 and a substantial part of the right-of-way for

---

3. Hereinafter the actual acreage of 137.341 shall be referred to as 137 acres.

the Northwest Expressway had been obtained from other property owners by 1972.

Prior to trial of this case, in the Circuit Court for Baltimore County, appellants filed a motion to determine a question of law. Appellants contended that all but 19 acres of the land taken should be valued at a value enhanced by the Northwest Expressway, since only 19 acres were required at the time the state became committed to the project. The state, on the other hand, contended that in valuing all 137 acres, any enhancement caused by the Northwest Expressway had to be excluded. The trial judge ruled that the state became committed to build the Northwest Expressway in 1954 and from that time until the actual taking in 1981 there was one ongoing project. The court further ruled that expert opinion testimony on the value of the property could not include any enhancement attributed to the proposed Northwest Expressway. At the conclusion of the trial the court instructed the jury as follows:

"The Court instructs you that you must exclude any increment in value proximately caused by the public project for which the property condemned is needed. This means that you must consider the property as if no Northwest Expressway or mass transit facilities such as involved in these proceedings, were even contemplated by the State."

The jury instruction and the ruling on opinion testimony necessarily followed from the trial court's conclusion that this was one project. After carefully examining all of the testimony presented and reviewing the numerous exhibits, we have concluded that the trial court was in error in reaching this conclusion. Our review of this record has convinced us that the construction of the Northwest Expressway and the construction of the Mass Transit facility and adjacent parking areas were in fact two separate projects for the purpose of determining just compensation.

(II)

■ In a condemnation proceeding the landowner is entitled to compensation equivalent to the market value of property according to the highest and best use of the property. The statutory definition of "fair market value" is set forth in Maryland Code (1974, 1981 Repl.Vol.), Real Property Article, § 12–105(b), which states:

"The fair market value of property in a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a vendor, willing but not obligated to sell, would accept for the property, and which a purchaser, willing but not obligated to buy, would pay, excluding any increment in value proximately caused by the public project for which the property condemned is needed. In addition, fair market value includes any amount by which the price reflects a diminution in value occurring between the effective date of legislative authority for the acquisition of the property and the date of actual taking if the trier of facts finds that the diminution in value was proximately caused by the public project for which the property condemned is needed, or by announcements or acts of the plaintiff or its officials concerning the public project, and was beyond the reasonable control of the property owner."

This Court has consistently stated, in accordance with § 12–105(b), that the fair market value of property condemned cannot include or take into account any increment in value which may be proximately caused by the public project for which the property is being taken. *Dodson v. Anne Arundel County,* 294 Md. 490, 495, 451 A.2d 317, 320 (1982); *State Roads Commission v. Parker,* 275 Md. 651, 683, 344 A.2d 109, 127 (1975); *King v. Mayor of Rockville,* 249 Md. 243, 251, 238 A.2d 898, 903 (1968). In the instant case neither party challenges that rule of law; it is the application of that rule to the facts of this case that is in question.

Appellants concede that the fair market value of 19 acres should not be determined at a value enhanced by the

Northwest Expressway, since this is the project that the property was taken for. However, they contend that they were entitled to have the land taken for the Mass Transit facility and Owings Mill Boulevard appraised at a value enhanced by the pre-existing commitment of the state to build the Northwest Expressway. Appellee contends that in valuing all 137 acres any enhancement caused by the Northwest Expressway should be excluded, because all of the land was taken for one project.

### (A)

A legal test has been devised to determine this situation. This test, known as the "scope of the project" rule, is simply stated:

"If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project."

*United States v. 320 Acres of Land,* 605 F.2d 762, 781–82 (5th Cir.1979). The "scope of the project" rule was fully articulated by a unanimous court in *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), wherein a condemnee was denied enhancement value because the property was likely to have been taken for the project at the time the government became committed to it. However, the Court stated that if, after the government became committed to the project, the government had decided to take this land as part of a subsequent enlargement, then the condemnee would be due the enhancement value. In other words, if the land was not within the scope of the original project "the subsequent enlargement of the project to include [it] ought not to deprive the [landowner] of the value added in the meantime by the proximity of the improvement." *Miller,* 317 U.S. at 377, 63 S.Ct. at 281, 87 L.Ed. at 344.

The Supreme Court reaffirmed the "scope of the project" rule and refined it in *United States v. Reynolds,* 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). The Court stated that although the rule was clear, application to a particular set of facts required discriminating judgment.

> "The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use."

*Reynolds,* 397 U.S. at 21, 90 S.Ct. at 807–08, 25 L.Ed.2d at 18.

### (i)

Appellants unsuccessfully argued to the trial court that the principle of just compensation required a finding that the "scope of the project" rule was applicable to the facts of this case; and if applied would result in a finding that the project was subsequently enlarged, and the value of the property taken was entitled to enhancement. Appellee argued below and on appeal that the "scope of the project" rule is not constitutionally required and is inappropriate under Maryland law. The basis of this argument is that section 12–105(b) of the Real Property Article provides sufficient statutory guidance for valuation in condemnation cases.

Article III, § 40 of the Maryland Constitution and the Fifth Amendment of the United States Constitution mandate just compensation for private property which is taken for public use. It is true that neither contains mention of the "scope of the project" rule or, for that matter, the principle of highest and best use. However, both concepts have been utilized by courts in order to determine "just" compensation. Although Maryland has not as yet expressly adopted the "scope of the project" rule, other secondary rules have been incorporated into condemnation law. *Dodson,* 294 Md. at 495, 451 A.2d at 320.

Federal law provides for basically the same measure of compensation in condemnation cases as Maryland law. Consequently, federal cases have been held to be applicable precedents to Maryland condemnation law. *Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 321 A.2d 748 (1974).

As early as *Kerr v. South Park Commissioners*, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924 (1886), and *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), the Supreme Court has held that property taken for a public project is not entitled to any enhancement from that project. This rule has been reaffirmed in *Reynolds, supra,* and *Miller, supra,* wherein the "scope of the project rule" was propounded as a secondary rule. This rule has since been applied in numerous federal and state condemnation cases.[4]

After a thorough review of the case law on this issue we do not find the "scope of the project" rule to be in conflict with the Maryland Real Property Article. We observe that the statute itself, § 12–105(b), specifically refers to "public project," meaning, of course, a defined project. The "scope of the project" rule is a means to determine whether the property taken was probably within the contemplation of the parties from the date the government entity became committed to the project. If it was, then no enhanced valuation is permitted; this is in accord with the Maryland statute. If it was not, then enhanced valuation is permitted; this is also in accord with the Maryland statute. In either instance the property is not being enhanced by the project for which it is being condemned. The determination of value will still be based on the requirements of our general condemnation statutory law.

4. For a compilation of such cases see Annot., 14 A.L.R. Fed. 806 (1973, 1983 Supp.); Annot., 95 A.L.R.3d 752 (1979, 1983 Supp.); 27 Am. Jur.2d *Eminent Domain* § 283 (1966, 1982 Cum.Supp.).

■■■ "Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings." *Miller*, 317 U.S. at 375, 63 S.Ct. at 281, 87 L.Ed. at 344; *see also 320 Acres of Land*, 605 F.2d at 781. The constitutional requirement of just compensation requires that enhancement in value be taken into consideration in certain instances, "since fair market value is generally to be determined with due consideration to all available economic uses of the property at the time of the taking." *Reynolds*, 397 U.S. at 17, 90 S.Ct. at 805, 25 L.Ed.2d at 16; *see also* Md.Code (1974, 1981 Repl.Vol.), Real Property Art., § 12–105(b). We therefore deem it proper to apply the "scope of the project" rule to the facts of the instant case.

### (ii)

Appellee further contends that even if the "scope of the project" rule is applied here, the result in this case would be the same. That is, all 137 acres that were condemned were within the scope of the project and thus their value is not entitled to be enhanced by the government's undertaking of the project. We disagree.

The question is when in the continuum of the project from conception to fruition are land values to be frozen with respect to the impact of the project? The other jurisdictions to consider this issue agree that it is the date that the condemnor becomes committed to the project. All parties in the case *sub judice* agree that the state became committed to building the Northwest Expressway in 1954. Moreover, the trial judge particularly found this to be the date of commitment.[5] In some instances the commitment date may be the date the government announced the project. However, if there is a considerable length of time between the announcement and the taking this may mitigate against using such a date. *320 Acres of Land*, 605

---

**5.** No appeal has been taken from this ruling. We consider the commitment date in this case to provide guidance in application of the "scope of the project" rule.

F.2d at 806. Under those circumstances the date of commitment was defined as,

"the date as of which the landowners or prospective purchasers no longer could reasonably anticipate being able to devote these properties to their highest and best use in the context of the surrounding governmental project, without serious apprehension that the properties would soon be condemned. In other words, it is the date as of which the prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property."

*320 Acres of Land,* 605 F.2d at 807.

The record in this case indicates that the Northwest Expressway was initially considered in 1948. The project was announced to the public and funds were budgeted for it in 1954. Construction plans and right-of-way plats were initiated and some property was acquired for the Expressway. In 1957 the centerline of the highway was established. From the time the project was announced people were aware that the Expressway would be built in this area; people were aware of the general path of the highway; there was a reasonable expectation that part of appellants' land would be taken for the Expressway. At this time landowners and prospective purchasers could not expect to devote part of these properties to their highest and best use. However, this announcement did create a new market for the remaining and neighboring land, a consideration that we shall examine further.

In view of the above, we cannot say that the finding of the trial judge that the state was committed to the project in 1954 was clearly erroneous. However, under the aforementioned definitions of "committed" we cannot say as a matter of law that the proposal to build the Northwest Expressway encompassed the project that was finally undertaken, requiring as it did 137 acres of appellants' property.

Appellee relies on *Miller* and *Reynolds* to support the position that the state contemplated one project in this case. We do not think these cases support this position.

In *Miller* the Court disallowed any increment in value due to the government's dam and reservoir project when it condemned property for a railroad right-of-way. The Court gave the following reasons:

> "The project, [dam and reservoir] from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents' lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation."

*Miller*, 317 U.S. at 377, 63 S.Ct. at 282, 87 L.Ed. at 345. Thus in *Miller* the property owners were on notice that their land might be taken in conjunction with the dam and reservoir project. Here the property owners were also aware that their land would probably be taken for the Northwest Expressway project. The crucial difference is they expected 19 acres to be taken; they are not asking this Court, nor did they ask the trial court, for enhancement of that 19 acres. In *Miller,* the dam and reservoir and the relocation of the right-of-way were all contemplated at the same time. Here 11 years after the project was announced a study was published on the feasibility of a rapid rail line in this area. Appellants could not have been on notice of this development at the time the state became committed to the Northwest Expressway.

The rule as refined in *Reynolds,* rather than support appellee's position, behooves us to further examine the

facts of this case, in order to apply the "scope of the project" rule with "discriminating judgment." *Reynolds*, 397 U.S. at 21, 90 S.Ct. at 807, 25 L.Ed.2d at 18. The route of the Expressway was specified in the proposed plans from the onset of the project, although the Expressway was ultimately positioned 900–1,000 feet to the west; nevertheless, no additional land than that originally planned was required. However, it is not clear that "during the course of the planning or original construction it became evident that [137 acres] would probably be needed" for the original project. *Reynolds*, 397 U.S. at 21, 90 S.Ct. at 807, 25 L.Ed.2d at 18.

Three factors have been identified as relevant to a determination of whether, from the time the government became committed to the project, it was evident to the public that the condemned property might be taken for the project. *United States v. 62.17 Acres of Land*, 538 F.2d 670 (5th Cir.1976); *United States v. 320 Acres of Land, supra.* When we apply those factors to the present case we are compelled to reach a determination contrary to that urged by appellee.

(a)

The foreseeability that the original proposed dimensions of the project might have to be changed to include the condemned property.

In *United States v. Eastman*, 528 F.Supp. 1177 (D.Or. 1981), the government required additional land because several years after the start of a reservoir project the engineers discovered that once the reservoir was completed it might suffer from a turbidity problem due to soil erosion from nearby lands. The additional land was needed to correct this anticipated problem. The Court held the foreseeability factor weighed against the government.

"The most astute and informed landowner surely could not have foreseen that land would be needed to control

erosion until after the Corps had reached such a conclusion."

*Eastman,* 528 F.Supp. at 1183.

In *United States v. Crance,* 341 F.2d 161 (8th Cir.), *cert. denied,* 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965), the Court reached a contrary conclusion when property was taken for a recreational area adjacent to a reservoir.

"The significant factor here is that this project contemplated recreational areas from its very inception and certainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the Crance property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use."

*Crance,* 341 F.2d at 165.

In the instant case when the state became committed to build the Northwest Expressway, in 1954, the project entailed a road through appellants' property with an interchange at Painters Mill Road and required 19 acres of this land. At that time and for at least the next 11 years, no one contemplated building a Mass Transit Project. Even the most "astute and informed" landowner, *Eastman,* 528 F.Supp. at 1183, could not have foreseen that property surrounding the Northwest Expressway "would probably be incorporated" for the Transit facility. *Crance,* 341 F.2d at 165.

### (b)

#### The length of time between commencement of the project and condemnation of the property.

The length of time between the commitment to the project and the condemnation was 27 years. The length of time between the commitment and the "possibility" of a

rapid transit system was at least 11 years.[6] While time "does not, in and of itself, decide the scope question," *320 Acres of Land,* 605 F.2d at 792, it is a factor to be considered. In this instance it is an important factor because of the protracted period of time involved.

Here there was sufficient time for the market value of the property to increase because of the state's announcement that the Northwest Expressway would be built, and the proximity of this land to that road. In cases where the time lapse has been much shorter landowners have been permitted to recover compensation for this increased value. "[T]he longer the Government waits to condemn property ..., the more it tends to abandon that property as benefitted by [the original project] to the private market." *320 Acres of Land,* 605 F.2d at 793; *see also Eastman,* 528 F.Supp. at 1183.

(c)

Government representations concerning the finality of the project as originally announced.

Appellee attaches great weight to the fact that the state represented the proposed plans as tentative. While this fact distinguishes this case from others where landowners received specific government assurance that their land would not be taken,[7] it is not determinative.

For many years the Northwest Expressway was the only project included in the proposals. The centerline of the road was established and remained unchanged. The inference one could draw from the words "TENTATIVE AND SUBJECT TO REVISION" was that it related to the original expressway; a change could be made in the configura-

---

6. We make no comment here on when the state became committed to the second more comprehensive project.

7. *United States v. 172.80 Acres of Land,* 350 F.2d 957 (3rd Cir.1965); *United States v. 2,353.28 Acres of Land,* 414 F.2d 965 (5th Cir.1969). *Cf. United States v. Crance,* 341 F.2d 161 (8th Cir.), *cert. denied,* 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965).

tion of the Expressway. If this had happened, as it did in this case by relocating the road 900–1,000 feet to the west, appellee's position would be stronger. However, to infer that "TENTATIVE ..." meant subject to inclusion of a Mass Transit facility is unsupportable. The Mass Transit facility was not even under study until many years later.

■ Utilizing all of the above factors we conclude that the land taken for the Mass Transit facility and Owings Mills Boulevard was not within the scope of the project and enhanced value may be considered as an element of compensation for the taking of 118 acres.

### (B)

Realizing that discriminating judgment must vary with the facts of each particular case, we find it necessary to discuss a further consideration in this case. There is an equitable consideration that must be confronted. To frame the inquiry we quote the following from *320 Acres of Land:*

"would compensation for value attributable to the very project for which property is taken be just or unjust? *Miller* and *Reynolds* teach that compensation would not be just, and therefore is not required, if the additional value reflects the Government's special demand for the property and the fact that it is acquiring private property for a public project through eminent domain. But they also teach that compensation *is* required, and just, where the increment in value attributable to the Government project is instead an element of fair market value inherent in the property's proximity to the Government project.

Whether or not that increment in value is attributable more to the Government's special demand for the property or more to a private market demand for benefits conferred upon the property by its proximity to the Government project is largely a function of reasonable expectations. The crucial inquiry is whether, after commencement of project A but prior to condemnation of

property x, the owner or a private purchaser contemplating acquisition and development of property x could *reasonably* anticipate that he would be able to devote that property to its highest economic use, enjoying the advantages inherent in its proximity to the nearby Government project, without serious apprehension that property x would soon be condemned."

*320 Acres of Land,* 605 F.2d at 793.

■ Our underlying inquiry in condemnation cases is what measure of damages provides "just" compensation. We must always be mindful that just compensation has a constitutional element of fairness to the landowner; but there is also an element of equity to the public that must be considered. *Bauman v. Ross,* 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897). That is why there is a prohibition on allowing people to profit when land values rise solely because the government creates a market for property. However, when the government announces and makes preparatory plans to build a project or improvement, and it is expected that the improvement will be of such a character as to benefit the surrounding land, land values in the area rise in anticipation. The general rule is that any enhancement in value which is brought about in anticipation and by reason of a proposed improvement is to be excluded. *Miller, supra; Shoemaker, supra; Kerr, supra; Big Pool Holstein Farms, Inc. v. State Roads Commission,* 245 Md. 108, 225 A.2d 283 (1967). However, if the land is expected to be outside the boundaries of a proposed improvement, and is in fact outside, then the increase in values of this land taken for another project must be recognized. This is the type of situation that the "scope of the project" rule addresses.

It would be incompatible with the principles underlying just compensation for the government, as in this case, to announce a project and then, 27 years later, build a substantially enlarged project and say that this is one project and one taking. Until the state became committed to build the Rapid Transit facility on appellants' property, the market

value of that property was enhanced by its proximity to the proposed Northwest Expressway. This is emphasized by the fact that appellants—willing buyers—bought the property from a willing seller because of its proximity to the Northwest Expressway. The property, previously undeveloped land, was purchased to develop as a commercial enterprise. This certainly is evidence under the test in *320 Acres of Land* that the state was not committed to the Transit facility in 1965, when people were still willing to purchase such property.

The trial court referenced the fact that appellants were expecting to profit from a business gamble. But, exactly what was the nature of that gamble: they bought the property in expectation that the Expressway would be built; they probably paid an increased price for this property because its value was based on proximity to the proposed Expressway; they wanted to develop the property to its highest and best expected use. But, did they gamble that the state would then take this property, for a project no one was aware of, and pay for it at its pre-Northwest Expressway value. Appellants would have made a bad business decision if the state decided not to build the original road— as we see it—that was the extent of this gamble.

Courts are usually concerned with the "windfall" landowners attempt to extract from the government by reason of the government's need for the property. However, as we see the facts of this case, not to permit enhanced valuation would result in a windfall for the state because they delayed building the Northwest Expressway. This would also result in an unconstitutional taking by allowing the government to, in effect, restrict the free transfer of property in areas of a proposed taking, especially when the projects take 27 years to complete.

Based on all of the above principles, and considering the evidence presented, the Court concludes that the taking of the entire tract was not included in the project from the beginning. The 137 acres were not "probably" within the

scope of the project from the time the state was committed to build the Northwest Expressway. To the contrary, the taking constitutes a subsequent enlargement of the project in the taking of which appellants are entitled to any enhancement of value added by the proximity of the subject property to the Northwest Expressway. We therefore hold that the ruling of the trial judge that evidence of enhanced value be excluded was in error. Under the facts of this case the jury may properly consider enhanced value in determining just compensation.

JUDGMENT REVERSED.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

APPELLEES TO PAY THE COSTS.