THE METROPOLITAN GOVERNMENT OF )
NASHVILLE and DAVIDSON COUNTY, )
TENNESSEE, and )
THE METROPOLITAN NASHVILLE )
AIRPORT AUTHORITY, )
)
     Petitioners/Appellants, )   Appeal No.
)   01-A-01-9503-CV-00089
v. )
)   Davidson Circuit
OVERNITE TRANSPORTATION )   No. 87C-181
COMPANY, a Virginia )
Corporation of Nashville and )
Davidson County, Tennessee, )
)
     Respondent/Appellee. )

**FILED**

**Oct. 19, 1995**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE HAMILTON GAYDEN, JUDGE


CHARLES W. BURSON
Attorney General and Reporter

MICHAEL E. MOORE
Solicitor General

MICHAEL W. CATALANO
Associate Solicitor General
Office of the Attorney General and Reporter
Executive Offices
500 Charlotte Avenue
Nashville, Tennessee 37243-0497
    ATTORNEYS FOR PETITIONERS/APPELLANTS



HARWELL HOWARD HYNE
Gabbert & Manner, P.C.
Jonathan Harwell
C. Mark Pickrell
1800 First American Center
Nashville, Tennessee 37238
    ATTORNEYS FOR RESPONDENT/APPELLEE



VACATED AND REMANDED


              SAMUEL L. LEWIS, JUDGE

O P I N I O N

This is an appeal by the petitioners/appellants, Tennessee State Department of Transportation ("TDOT") and Metropolitan Nashville Airport Authority ("MNAA"), from a jury verdict and judgment valuing four acres of condemned property owned by the respondent/appellee, Overnite Transportation Company ("Overnite"), at $1,759,578.10.

**ISSUES**

The petitioners/appellants raise two issues on appeal:

1) Whether the evidence preponderates against the trial court's finding that the petitioner's property, which was condemned as part of the discrete access road connecting Interstate 40 to the new airport terminal complex of the Metropolitan Nashville Airport, was not within the scope of the project?

2) If so, whether the petitioner is entitled to a new trial on the grounds that evidence was introduced to the jury by the [respondent], which included the enhanced value of the property taken for the discrete access road, based upon the relocation of the new terminal complex?

In April 1979, MNAA began the Metropolitan Airport Master Plan Update, a study of the development of a new terminal complex at the Metropolitan Nashville Airport. The Update included five alternatives for the construction of a discrete access road to serve the airport from Interstate 40. Of the alternatives, two required the taking of Overnite's property and two did not. The fifth alternative did not specifically mention Overnite's property, but MNAA's Director of Planning and Programming testified that it did not require the taking of Overnite's property. The Update recommended the fifth alternative. MNAA's Board of Commissioners approved the study and incorporated it into the Board's resolution verbatim. In December 1980, the Board announced to the public its plans to construct the new terminal.

-2-

In August 1981, the original grading plans for the new terminal project showed that MNAA might need a small portion of Overnite's property to build the discreet access road. In 1982, the Metropolitan Planning Commission approved MNAA's plans for the construction of the new terminal, including the construction of the discreet access road. The project required that MNAA obtain a zoning variance. The Metropolitan Board of Zoning Appeals sent hearing notices to all neighboring and affected property owners, including Overnite, and approved the variance in June 1982. Also in 1982, the Department of Public Works issued a letter approving the grading, drainage, and erosion control plans for the entire project. Those plans showed the discrete access road crossing through Overnite's property. The trial record, however, is unclear as to whether the grading plans showing the taking of Overnite's property became part of the public record through the zoning appeal or through the letter issued by the Department of Public Works.

Despite the grading plans, evidence presented at trial indicated that in 1982 and for some years thereafter MNAA had not decided the exact location of the discrete access road. In 1983, TDOT agreed to purchase the right-of-way for the discrete access road in exchange for a conveyance of airport property. MNAA asked TDOT to acquire property for the discrete access road because MNAA did not have the power to exercise eminent domain. Though ultimate design questions had not been answered, by 1986, TDOT was appraising Overnite's property so it could make an offer to purchase land for the discrete access road. TDOT based its appraisals of Overnite's property on the property's proximity to the airport and reported that in the rapidly expanding airport commercial area the highest and best use of the property was intense hotel/motel commercial development. TDOT hired another appraiser in 1993 who also considered the location of the new terminal in valuing Overnite's property.

In January 1987, TDOT filed a petition for condemnation of 4.257 acres of Overnite's land and tendered $741,980.00 to the Davidson County Circuit Court Clerk. This amount represented TDOT's estimation of Overnite's damages. The Davidson County Circuit Court entered an order of possession in February 1987. Overnite filed an answer denying that $741,980.00 represented the fair market value of the property TDOT sought to condemn. In answer to interrogatories from Overnite concerning the valuation of the property, TDOT provided Overnite with the appraisals conducted in 1986 which valued the property based on its proximity to the new terminal. TDOT never updated its answers to these interrogatories.

The case was originally set for trial on 6 December 1993, but the court continued the case and eventually set it for 20 June 1994. On 6 May 1994, TDOT filed a motion requesting that the court not allow Overnite to introduce evidence of the value of its property based on its proximity to the new terminal. On 26 May 1994, TDOT filed a notice that its appraisers could present a valuation of the property excluding the effect of the new terminal before trial. TDOT also said that it would submit the valuation and its basis to Overnite; however, Overnite never received such a submission.

On 4 June 1994, the trial judge denied TDOT's motion. The judge found that TDOT's request to change its legal theory of just compensation came "too late" and that TDOT failed to show that the taking of Overnite's property was probably necessary in 1980. Consequently, the judge held that Overnite could offer evidence of the value of its property based on its proximity to the new terminal, and at trial, he issued instructions to the jury reflecting that holding.

Regarding the valuation of the property, the jury returned

a verdict of $1,759,578.10. The trial judge entered a judgment to that effect which also provided for the payment of interest on $1,017,778.10, the difference between the jury award and the amount deposited with the court clerk. The trial court denied a motion filed by TDOT requesting a judgment not withstanding the verdict and a new trial. On 28 November 1994, TDOT filed a notice of appeal.

We will address appellants' issues together by discussing the proper formulation of the scope of the project rule and its application to the case at bar.

## (I)

**Under the most recent formulation of the scope of the project rule, the state need not compensate condemnees for any enhancement in the value of their property caused by the project which makes condemnation necessary if, at the time the state committed to the project, it was reasonably foreseeable that the government might take the condemnees' property.**

The United States Constitution and the Tennessee Constitution mandate that landowners be paid "just compensation" when their property is taken for public use. U.S. Const. amend. V; Tenn. Const. art. I, § 21. Traditionally, just compensation was the market value of the property to be taken. ***United States v. Reynolds***, 397 U.S. 14, 16-17, 90 S.Ct. 803, 805, 25 L. Ed. 2d 12, 16 (1970). When the market value of the property rises solely because of governmental demand for the property, however, it is not just to require the public to pay the above normal market value.[1]

---

[1] ***United States v. Reynolds***, 397 U.S. 14, 16-17, 90 S. Ct. 803, 805, 25 L. Ed. 2d 12, 16 (1970). Three considerations support this proposition. ***United States v. 320.0 Acres of Land,*** 605 F.2d 762, 782 (5th Cir. 1979). First, by entering the market as a purchaser with a unique and pressing demand, the Government has distorted the market. Thus, the selling price is not the actual fair market value. Second, forcing "the Government to pay ... a premium over that which the property would bring on the open market absent the Government's demand would increase the cost of public projects and perhaps frustrate some public objectives." ***Id.*** Third, permitting "recovery of value that is not created by fair, open market conditions would be to award a few private

-5-

Consequently, courts created the scope of the project rule.  Lands situated near public improvement projects tend to increase in value.  ***United States v. Miller***, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L. Ed. 336, 344 (1943).  Courts designed the scope of the project rule to allow landowners to benefit from enhancement in the market value of their land caused by its being close to a public improvement.  Simultaneously, the rule prevents speculation on the government's activities at the public's expense by landowners or prospective purchasers.  ***See Layne v. Speight***, 529 S.W.2d 209, 212 (Tenn. 1975) (quoting ***Miller,*** 317 U.S. at 376-77).

The scope of the project rule, formulated by the United States Supreme Court in ***Miller*** and later adopted by the Tennessee Supreme Court in ***Layne,*** is easy to state:   If the property being condemned was "probably within the scope of the governmental project from the time the Government was committed to it," the landowner is not entitled to compensation for any increase in value caused by the project.   ***Miller***, 317 U.S. at 376-77.  The rule, however, is not so easy to apply.  ***United States v. 320.0 Acres of Land,*** 605 F.2d 762, 782 (5th Cir. 1979) [hereinafter ***Monroe County***].  Consequently, the Court clarified the federal scope of the project rule in ***United States v. Reynolds.***  Although dicta, the Court restated ***Miller's*** rule and noted the following:

> As with any test that deals in probabilities, its application to any particular set of facts requires discriminating judgment.  The rule does not require a showing that the land ultimately taken was actually specified in the original plans for the project.  It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public use.

***Reynolds,*** 397 U.S. at 21 (footnote omitted).

---

propertyholders windfall gains solely because of public needs and exigencies."
***Id.***

The Tennessee Supreme Court has cited the **Reynolds'** clarification of the federal scope of the project rule. **Layne**, 529 S.W.2d at 212-13. In **Layne**, the court noted that **Reynolds** had "merely restated the crux of **Miller,"** but the court also seemed to cite with approval the additional **Reynolds'** clarification quoted above. **Id.** In a later case, the Court of Appeals of Tennessee, Eastern Section, adopted the **Reynolds'** clarification. **State v. Hodges**, 552 S.W.2d 400, 402 (Tenn. App. 1977). In **Hodges**, the State condemned 57 acres of the defendant landowner's property for a highway construction project in 1971. Three years later, after the State had completed part of the project, the State discovered that it would need an additional 1.75 acres of the defendant landowner's property to maintain a stable slope. **Id.** at 400. The trial judge, relying on **Miller**, held that the additional 1.75 acres was outside the scope of the original project. **Id.** at 401. In light of **Reynolds**, the court reversed the trial court, but limited its holding to the particular facts of the case. **Id.** at 402. Since **Layne** and **Hodges,** only one other case in Tennessee has dealt with a scope of the project rule issue. **State Ex rel. Comm'r, Dep't of Transp. v. Veglio**, 786 S.W.2d 944 (Tenn. App. 1989) (affirming the trial court's finding that interchange upgrade and road widening projects were distinct). **Veglio** did not explicitly adopt, renounce, or mention the **Reynolds**' clarification. Nevertheless, based on **Layne** and **Hodges**, the **Reynolds**' clarification seems to be part of the scope of the project rule as adopted in Tennessee.

Since **Reynolds**, courts have refined the federal scope of the project rule to reflect landowners' and prospective purchasers' reasonable expectations as to whether a piece of property will be

taken.[2]

> In anticipation of a proposed project, real property adjacent to or near land to be taken frequently increases in value; however, the land which is expected to be taken does not legitimately share in this enhancement because its inclusion in the project will make it unavailable for private development. Any enhancement in the value of the land necessarily would result from speculation that the Government might be compelled to pay an artificially inflated price.

*United States v. 2,353.28 Acres of Land,* 414 F.2d 965, 967-68 (5th Cir. 1969) [hereinafter Brevard County]*.*

As a result, land is within the scope of the project when a buyer in the real estate market could reasonably expect that the property in question might become part of the project and when the increase in value of the property is attributable to speculation on the government's activities. *See Monroe County*, 605 F.2d at 791.


(II)

To apply the scope of the project rule to the case at bar, the court must decide two issues. The first is when did  MNAA commit to the new terminal project. The second is whether, on that date, Overnite or a prospective purchaser could have reasonably expected that Overnite's property might become part of the new terminal project. The burden of proving whether the condemned property was probably within the scope of the project is on the State. *Layne*, 529 S.W.2d at 213. We review the trial court's

---

[2] *See, e.g., United States v. 49.01 Acres of Land,*  669 F.2d 1364, 1367 (10th Cir. 1982) (holding that the scope of the project rule, as enunciated by *Miller* and *Reynolds*, requires the Government to pay the enhanced value of the land if "the landowner reasonably believed that subsequent government action removed the property from the project's scope." *United States v. 320.0 Acres of Land,* 605 F.2d 762, 793 (5th Cir. 1979) (noting that the "crucial inquiry" is whether a landowner or a private purchaser could reasonably anticipate that he would be able to devote the property to its highest and best economic use without serious fear that the government would soon condemn the land); *United States v. 31.43 Acres of Land,* 547 F.2d 479, 481-82 (9th Cir. 1976) (finding no error in the trial court's finding that property lay within the scope of the project where no public information existed that could lead a property owner to believe that his land would not be a probable object of condemnation); *United States v. 172.80 Acres of Land*, 350 F.2d 957, 959 (3rd Cir. 1965) (holding that a landowner was entitled to the enhanced value of his property because a purchaser contemplating acquisition and development of the property could have reasonably anticipated that, at the time the Government committed to the project, he would be able to devote that land to its highest economic use without serious apprehension of condemnation); *United States v. Eastman*, 528 F. Supp. 1177, 1182 (holding that the Fifth Circuit's reasonable-expectations test requires that the enhanced value be an element of a landowner's condemnation award).

finding on the scope of the project de novo accompanied by a presumption that the finding is correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

(A)

**As of 1980, after the State funded and announced the project to the public, the prospect of the project becoming a reality became sufficiently definite such that, at that time, MNAA can be said to have committed to the new terminal.**

According to the reasonable expectations formulation of the scope of the project rule, the commitment date is the date on which the prospect of imminent condemnation becomes "sufficiently definite" or, in other words, when the prospect of imminent condemnation would be a "major factor in the decision of any reasonable person to buy or develop the property." *Baylin v. State Roads Comm'n*, 475 A.2d 1155, 1161 (Md. 1984) (quoting *Monroe County*, 605 F.2d at 807). In *Baylin*, the State Roads Commission developed a plan for the construction of an expressway in 1948. The State budgeted funds for the project as of 1954. *Id.* at 1156. Nevertheless, construction on the expressway did not begin as planned because the State transferred the funds to another highway project. In the early 1970s, the State proposed a plan to combine the expressway project with a mass transit project. The addition of the mass transit project required the taking of additional acres of the appellant landowner's property. *Id.* at 1157. In 1981, the State commenced condemnation proceedings against 137 acres of the appellant landowner's property, 118 acres more than originally planned. *Id.* at 1158.

On appeal, the court cited the trial court's finding that the State committed to the project in 1954 with approval. The court found that the State announced the project to the public and

funded it in 1954.  As of this time, people were familiar with the expressway's planned location and its general path.  Consequently, the court found that as of 1954 landowners and prospective purchasers could not expect to devote their property to its highest and best use.  *Id.* at 1161.

In the instant case, the trial court found that MNAA committed to the new terminal project in 1980.  Appellants argue that MNAA had not committed to the project until 7 June 1982 when the Metropolitan Board of Zoning Appeals granted MNAA a conditional use permit.  Without such approval, appellants argue, MNAA could not have built the new terminal project.  The date of commitment, however, is not the date on which the occurrence of the project becomes a legal certainty, but is the date on which the probability that the project will occur becomes a major factor in a person's decision to buy or develop the property.  *Id.* (quoting *Monroe County*, 605 F.2d at 807).

Here, MNAA announced the new terminal project to the public in December 1980.  In some condemnation cases, a just commitment date is the date the state announced the project.  *Monroe County*, 605 F.2d at 806; *Baylin*, 475 A.2d at 1161.  Once the State announces the project, the probability of condemnation will affect the decisions of  ordinary investors in the real estate market.  *See United States v. Miller*, 317 U.S. 369, 377 (1943).  Further, MNAA approved funding for the new terminal project in December 1980.  Money approved is usually spent, and thus, the likelihood that a prospective project will become a reality is far greater.  In the face of a public announcement and approved funding, the need for a zoning permit does not create sufficient uncertainty to compel this court to hold that the trial court erred in finding that MNAA committed to the new terminal project in 1980.

**(B)**

> **At the time the MNAA committed to the new terminal project, the possibility of condemnation of Overnite's property was sufficiently serious such that the property can be said to be within the scope of the project.**

Knowing the commitment date, the court must decide whether, on that date, the owner of the land to be taken could reasonably expect to be able to devote his land to its highest economic use without serious apprehension that the State would soon condemn the property. *See Monroe County*, 605 F.2d 762, 793 & n.44 (5th Cir. 1979). Several courts consider the following three factors to determine if the taking was reasonably foreseeable: (1) the foreseeability that the government would change the original plans to include the property, (2) the length of time between the commencement of the project and the taking in question, and (3) the Government's representations concerning the finality of the original plans. *See, e.g., United States v. 62.17 Acres of Land,* 538 F.2d 670, 680 (5th Cir. 1976) [hereinafter *Jasper City*]; *Baylin*, 475 A.2d at 1162-64; *State Dep't of Transp. v. Montgomery Ward Dev. Corp.*, 719 P.2d 507, 513 (Or. App. 1986).

**(i)**

> **The foreseeability that MNAA would change the 1980 Master Plan Update, a continuing planning document, to include Overnite's property weighs in favor of a finding that the property was within the scope of the new terminal project.**

The application of the scope of the project rule calls for "discriminating judgment." *Jasper City*, 538 F.2d at 678. The Government need not actually specify the land ultimately taken in the original project for the land to come within its scope; it need only be evident that the Government might take the given tract

for the project.  *Id.*   In *Jasper City*, the Government did not specify the landowner's property in the original plans. Nevertheless, the Government's representations that it would take all of the property within the five year flood line and the probability of mistakes in surveying made it reasonably foreseeable that the Government would take the landowner's property.  *Id.* at 681.

The court in *United States v. Crance*, 341 F.2d 161 (8th Cir. 1965), reached a similar result.  In 1958, the Government purchased five acres from a landowner for a dam and reservoir project. *Crance,* 341 F.2d at 162.  From its inception, the project called for recreational facilities around the reservoir, but neither a 1956 preliminary design memorandum nor a 1960 public proposal of sites approved by the Chief of Engineers included taking any of the remainder of the landowner's tract.  *Id.* at 162-63.  After persons protested the lack of recreational facilities on the landowner's side of the reservoir, the engineers inspected additional sites including the landowner's tract.  *Id.* at 163.   After public meeting, the Government took the remaining 35 acres of the landowner's tract for the creation of a public use area.  *Id.*  The district court found that the property was not within the scope of the project.  Thus, it allowed evidence concerning the enhanced value of the property.  *Id.* at 162.

On appeal, the circuit court reversed the judgment of the district court.  *Id.* at 167.  The circuit court noted that none of the plans that excluded the landowner's additional property were final plans.  *Id.* at 164.  The circuit court found the significant factor to be that "the project contemplated recreational areas from its very inception."  It stated as follows:

-12-

> [C]ertainly property lying beyond a perimeter of the reservoir would probably be incorporated for recreational purposes if the land acquired for the reservoir alone was not also sufficient for recreational utilization. Since the [landowner's] property abutted the reservoir line, it was within the sphere of probable acquisition for recreational use.

*Id.* at 165.

Another court reached a different result on similar facts. *United States v. 172.80 Acres of Land,* 350 F.2d 957 (3d Cir. 1965) [hereinafter *Mercer County*]. In this case, the Government purchased 20 acres of a landowner's 100 acre tract for a dam and reservoir project. *Id.* at 958. During negotiations, the Government representative assured the landowner that the Government would not need other parts of his land for the project. Though the original project did not call for the creation of recreational areas, a change in the Government's policy concerning public developments and the use of reservoir areas prompted a decision to acquire the remainder of the landowner's property for recreational use. *Id.* The circuit court affirmed the holding of the district court that the enhanced value of the property was includable in the condemnation award. *Id.* at 959. Noting that the possibility of project expansion to include the property in question might have occurred to a perceptive landowner or prospective purchaser, the circuit court distinguished *Mercer County* from *Crance* based on the differences between the Government's representations and the original plans of the projects.

In the instant case, the discrete access road was part of the project from the time MNAA committed to it. The Airport Master Plan Update specifically called for the construction of a discrete access road to the new terminal. Overnite argues that it had no notice that appellants required its land for the discrete access

-13-

road.  However, MNAA's resolution adopting the Update incorporated it as if MNAA had copied it verbatim.  The Update included two discrete access road alternatives which required the taking of Overnite's property.  That MNAA considered Overnite's property for use in the construction of the planned discrete access road would likely have put Overnite on notice that MNAA might need its property for the project.

Also, because the alternative chosen by  MNAA did not require the taking of Overnite's property, Overnite argues it was reasonable for it to expect that MNAA would not take its property.  As noted in **Reynolds**, the Government does not have to specify the land to be taken in the original plans for the land to be within the scope of the project.  **United States v. Reynolds**, 397 U.S. 14, 21 (1970).  "It need only be shown that during the course of the planning or original construction it became evident that the land so situated would probably be needed for the public use."  **Id.**  "We cannot straightjacket the government in defining scope of the project, but on the other hand, we cannot permit global meanderings to enclave areas not reasonably to have been conceived as included at inception."  **Jasper City**, 538 F.2d 670, 678 (5th Cir. 1976).

From its inception, the new terminal project contemplated a discrete access road.  Further, the Master Plan Update, a "continuing planning document" considered Overnite's property for public use.  According to early plans for the new terminal project, the discrete access road was a small part of a much larger project, and the plans did not schedule it for construction until MNAA had almost the entire project completed.  As in **Jasper City**, the possibility that MNAA would need to make some adjustments to allow the discrete access road to accommodate the rest of the new terminal construction was reasonably forseeable.  Once the court

-14-

accepts the possibility of adjustment as reasonably foreseeable, the taking of Overnite's property, property that the State had already publicly considered for taking, is reasonably foreseeable as well. Thus, a holding that the 1980 Update was a final expression of the project for the purposes of defining the project's scope is unrealistic and would unnecessarily "straightjacket" the State in the construction of public projects. *See Jasper City*, 538 F.2d at 678. Further, a narrow interpretation of the scope of the project rule would encourage the State, when acquiring property, to obtain more land than it felt was absolutely necessary to avoid the risk of having to acquire additional property at an enhanced value. *State v. Hodges*, 552 S.W.2d 400, 402 (Tenn. App. 1977).

Overnite also argues that because TDOT, and not MNAA, took Overnite's property to build the discrete access road, the discrete access road and the new terminal construction were separate projects. In *John L. Roper Lumber Company v. United States*, 150 F.2d 329 (4th Cir. 1945), the court addressed a similar question. There, the Government authorized the Secretary of the Navy to establish a Marine Corps Training Area. *Roper,* 150 F.2d at 330. The Federal Works agency condemned Roper's property, which was across the highway from the training area, to house defense personnel. *Id.* The original plans for the Marine Corp Training area contemplated a housing project. *Id.* at 331. The court rejected Roper's contention that because a different government agency condemned the property, the property was outside the scope of the project:

> We cannot believe that the rule set forth in the Miller case should be nullified by the mere chance that an agency of the Government different from the one for whose use the land is taken, should, by reason of the fact that it holds available funds, be directed to institute condemnation proceedings.

*Id.*

*Roper* stands for the proposition that as long as the property in question is part of the project, the fact that the condemning authority is a different government agency is not relevant.  As a result, the fact that TDOT condemned Overnite's property for MNAA does not render the discrete access road outside the scope of the new terminal project.

### (ii)

**Six years, during which the project was continuously under construction, is a relatively short amount of time between the commencement of the terminal project and the taking of Overnite's property such that it weighs in favor of finding that Overnite could not reasonably expect to be able to devote its property to its highest economic use without serious apprehension of condemnation.**

Even where a condemnee's land is within the scope of the project at the time the state becomes committed to it, there comes a point in time when it would no longer be just to apply the scope of the project rule in the government's favor. *Monroe County*, 605 F.2d at 797.  At that time, the government's delay has removed the specter of condemnation created by the project's original scope. *See Jasper City*, 538 F.2d at 680.  Because of additional factors in *Monroe County*, the court did not define the "just" limits on the temporal reach of the scope of the project rule, but it did warn the Government that eighteen years might exceed those limits. *Monroe County*, 605 F.2d at 797.

However, other courts have directly addressed the temporal reach of the scope of the project rule.  In *Jasper City*, the Government delayed the taking for ten years. *Jasper City,* 538 F.2d at 680.  For the first five years, the Government was not aware

that an additional taking was necessary. *Id.* at 673. For the last five years, a lack of funding delayed the taking. *Id.* The circuit court noted that the delay in taking in the first five years was acceptable because there was a high probability of the need for adjustment given the nature of the project and because the need for adjustment would not reveal itself for five years. *Id.* at 680. Regarding the second five years, the circuit court remanded the case to the district court to determine if the delay in the second five years constituted a representation to the landowner that additional adjustments would not be necessary. *Id.*

In addition, the court in *Baylin* addressed the temporal reach of the scope of the project rule. *Baylin v. State Roads Comm'n*, 475 A.2d 1155 (Md. 1981). As previously discussed, in *Baylin*, the State committed to a highway project in 1954, but did not take the appellant landowner's property until twenty-seven years later. *Id.* at 1163. Plans for the project in the late 1950's showed that the State would require nineteen acres of the appellant landowner's property. *Id.* at 1156. The final plan, accepted in 1976, called for significantly more than nineteen acres of the appellant landowner's property. *Id.* at 1158.

At trial, the appellant landowner prayed for the enhanced value of the land above the original nineteen acres. *Id.* The trial judge found that the property was part of the scope of the project, and the appellate court reversed. *Id.* at 1165. The court noted that the length of time between the commencement of the project and the condemnation was an important factor because of the protracted time involved. *Id.* at 1163. The court found that it would be "incompatible with the principles underlying just compensation for the Government ... to announce a project and then, 27 years later, build a substantially enlarged project and say that

-17-

this is one project and one taking."  *Id.* at 1164.

The case at bar is unlike either *Jasper City* or *Baylin*.
First, in the present case, only six years elapsed from the
commencement of the project to the taking while in *Jasper City* and
*Baylin* it was eleven and twenty-seven years respectively.  Second,
here, the delay between the commencement of the project and the
taking was not the result of an intervening event such as a
surveying error or a loss of funding.  Instead, it was part of the
ongoing process of construction.  As noted in *Jasper City*,
"gradualism in acquisition is oft times fact and not fiction."
*Jasper City*, 538 F.2d at 680.  That the delay was part of the
normal process of construction makes the eventual taking more
foreseeable.  Third, in *Jasper City* and *Baylin*, the plans that did
not require the landowner's property were in place for several
years.  Here, MNAA changed the plan for the discrete access road
requiring no taking of Overnite's property in 1981, eight months
after MNAA announced it.

Overnite argues that until 1986 it had no knowledge that
MNAA had changed the plans to include Overnite's property, and
thus, the changes could not have affected Overnite's reasonable
expectations.  The trial record is ambiguous as to whether the
public record included MNAA's new plans which showed that
Overnite's property might be taken.  Unlike *Baylin*, however, there
is no evidence in the trial record that after the commencement of
the project Overnite received representations from MNAA or TDOT
that they would not take its property.

In other cases, courts have found delays of much longer than
six years insufficient to remove the condemned property from the
scope of the project.  An Oregon appellate court found that a 14

year delay was insufficient to render the property outside the scope of the project. *State Dep't Of Transp. v. Montgomery Ward Dev. Corp.*, 719 P.2d 507, 514 (Ore. App. 1986). One reason for the courts decision was that "[a]lthough the plans changed frequently during the 14 years before the actual taking, most plans called for some kind of taking similar to that which occurred." *Id.* at 514. Also, the court relied on the fact that "[t]here was no evidence of government representations which misled defendants or caused them any prejudice." *Id.* Similarly, the Utah Supreme Court held that an 11 year delay between the first and second condemnation was not so lengthy as to "constitute two separate projects." *Board of County Comm'rs v. Ferrebee*, 844 P.2d 308, 311 (Utah 1992). Specifically, the Utah Supreme Court stated that "[w]hile the County deserves no praise for speed, we cannot say that its actions constitute two separate projects, especially when it consistently and openly contemplated acquiring all of Ferrebee's property." *Id.* at 311.

### (iii)

**MNAA's representations as to the finality of the 1980 Master Update Plan were not so definite as to lead Overnite to believe that it could devote its property to its highest use without serious apprehension of condemnation.**

Courts give crucial consideration to the government's representations when determining scope of the project cases. *Monroe County*, 605 F. 2d at 792. If the government unequivocally represents to the landowner or the public that it will not need a certain parcel of property for a project, the government, in effect, assures the landowner that any enhancement in the value of that parcel will be based on its proximity to the government project. *Id.* at 793; *see also Mercer County*, 350 F.2d 957, 958 (3d Cir. 1965).

-19-

In *Brevard County,* 414 F.2d 965 (5th Cir. 1969), the court considered the effects of the Government's representations.  In that case, NASA condemned over 72,000 acres of land in August 1961. *Id.* at 967.  The Government did not include the appellant landowner's property in the original condemnation nor was there any evidence at that time that the Government intended to acquire the property.  In September 1961, before a Senate committee, a public official testified that NASA would not need any additional lands for the project. *Id.* at 969.  Subsequently in 1962, the need for additional launch pads necessitated the acquisition of an additional 14,800 acres including 654.43 from the appellant landowner. *Id.* at 966, 969-70 & n. 12.  The court reversed the judgment of the trial court which excluded evidence of the enhanced value of the appellant landowner's property. *Id.* at 972.  The court found that the public officials testimony in 1961 destroyed the persuasiveness of  the Government's argument that its 1961 plans were not conclusive. *Id.* at 971.

The instant case is distinguishable from both *Mercer County* and *Brevard County*.  In both of those cases, after the Government committed to the project, it made definitive representations that its plans were final and that the Government would not require the landowner's property.  Here, no such statements were made.  Further, as previously noted, the nature of the document which marked the State's commitment to the new terminal project, the importance of the discrete access road in relation to the entire project, and the scheduling of the construction of the discrete access road after MNAA completed most of the remainder of the project indicated that one could not reasonably expect the 1980 Master Plan Update to be MNAA's final expression of its plans for the discrete access road.

Consequently, the foreseeability that the State would take Overnite's property, the length of time from the date the State committed to the new terminal project to the date of the taking, and the State's representations as to the finality of the original plans all support a finding that Overnite's property was within the scope of the new terminal project. It therefore results that the judgment of the trial court is vacated and the case is remanded to the trial court for a new trial and any further necessary proceedings. Costs on appeal are taxed to appellee.

_____

SAMUEL L. LEWIS, JUDGE


CONCUR:


_____

HENRY F. TODD, P.J., M.S.


_____

BEN H. CANTRELL, J.